# Relevant Documents for the Courts Review

# Discovery

**JAMS ARBITRATION**

IN THE MATTER OF:

| | | |
|---|---|---|
| **RICHARD SADDLER** | ) | |
| | ) | |
| **Claimant,** | ) | |
| v. | ) | |
| | ) | |
| **CARVANA, LLC, BRIDGECREST** | ) | |
| **ACCEPTANCE CORP., and** | ) | |
| **DRIVE TIME AUTOMOTIVE** | ) | |
| **GROUP, INC.** | ) | |
| | ) | |
| **Respondents,** | ) | |
| | ) | JAMS Ref. No. 1440007303 |
| _____ | ) | |
| | ) | Arbitrator: Hon. Lawrence E. Mooney |
| **CARVANA, LLC,** | ) | |
| | ) | |
| **Counter-claimant,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **RICHARD SADDLER** | ) | |
| | ) | |
| **Counter-claim Respondent.** | ) | |

## CLAIMANT RICHARD SADDLER'S REQUEST FOR
## ARBITRATOR TO CLARIFY PARAGRAPH 10 C OF ORDER NO. 9

NOW COMES Claimant, Richard Saddler, Pro Se, and hereby requests that the Hon.

Lawrence E. Mooney to clarify paragraph 10 c of Order No. 9 pursuant to Jams Rule 19 and

states as follows:

Paragraph 10 c i of "Order No. 9 Plan of Discovery" provides in part that "Depositions to be completed by August 31, 2022. Pursuant to Rule 17(b), one (1) deposition per Party."

Jams Rule 17(b) provides in part that "Each Party may take one deposition of an opposing Party or of one individual under the control of the opposing Party. The Parties shall attempt to agree on the time, location and duration of the deposition. If the Parties do not agree, these issues shall be determined by the Arbitrator."

In this matter, there are three (3) parties who are Respondents – Carvana, Bridgecrest, and Drive Time. Saddler believes that Rule 17(b) allows him to take one deposition per party meaning that he can depose one witness from each of the three (3) parties. Otherwise, Saddler is severely prejudiced because Carvana, Bridgecrest, and Drive Time can each take one deposition and Saddler could only take a single deposition and would be forced to decide which one individual Saddler wants to depose among the three (3) Respondents.

Should Saddler be forced to choose a single individual to depose from three (3) Respondents, it would negatively impact his due process rights to obtain a fair and equitable conclusion to his legal issues against Carvana, Bridgecrest, and Drive Time while at the same time allowing each of the entities that are legally intertwined to take three (3) depositions.

WHEREFORE, Saddler requests that the Arbitrator clarify paragraph 10 c i of "Order No. 9 Plan of Discovery" in order that Saddler is able to properly determine who to depose and then schedule depositions.

Respectfully submitted,

**Richard Saddler,** *Pro Se*

413 Genoa Drive
Manchester, Missouri 63021
Telephone: (310) 428-2110
Email:

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Process Server and or emailed, and/or certified US Postal Service to the registered agents or Representatives listed below on this 26th day of May 2022, to the following:

**William A. Brasher**
Boyle Brasher LLC
1010 Market Street, Ste. 950
St. Louis, MO 63104

**M. Thomas McFarland**
Gullett Sanford Robinson & Martin PLLC
150 Third Avenue South, Ste. 1700
Nashville, TN 37201

*Attorney for all Defendants*
*Carvana, LLC*
*Drive Time Automotive Group, Inc.*
*Bridgecrest Acceptance Corporation*

**Richard Saddler,** *Pro Se*

# JAMS ARBITRATION

**IN THE MATTER OF:**

| | |
|---|---|
| **RICHARD SADDLER,** | ) |
| | ) |
| **Claimant,** | ) |
| | ) |
| v. | ) |
| | ) |
| **CARVANA, LLC, BRIDGECREST** | ) |
| **ACCEPTANCE CORPORATION, and** | ) |
| **DRIVETIME AUTOMOTIVE** | ) |
| **GROUP, INC.,** | ) |
| | ) |
| **Respondents.** | ) |
| —————————————————— | ) |
| | ) |
| **CARVANA, LLC,** | ) |
| | ) |
| **Counter-claimant,** | ) |
| | ) |
| v. | ) |
| | ) |
| **RICHARD SADDLER,** | ) |
| | ) |
| **Counter-claim Respondent.** | ) |
| —————————————————— | ) |

JAMS Ref. No. 1440007303

Arbitrator: Hon. Lawrence E. Mooney

## ORDER NO. 9
## PLAN OF DISCOVERY

Having reviewed the submissions of the parties, the Arbitrator announces the following Plan of Discovery.

**1.     Applicable Law and Procedure:** The JAMS Comprehensive Arbitration Rules and Procedures and the Consumer Minimum Standards apply.  The Federal Arbitration Act will apply in the Arbitration.  Missouri or Georgia law will be applied substantively to the Arbitration as appropriate.

**2.     Parties:** The parties to this Arbitration are Saddler and Respondents.

3. **Claim/Counterclaim:** Claimant must amend his claim, if at all, prior to **May 27, 2022**.

4. **Additional Preliminary Matters:** Any other preliminary matters not otherwise provided for herein shall be raised by the Parties by **June 10, 2022**.

5. **Dispositive Motions:** motions for summary disposition (i.e., dispositive motions) of any particular claim or issue shall be filed and served on or before **September 16, 2022**, not to exceed fifteen (15) double-spaced pages in length. The opposing Party shall file and serve its brief in opposition, not to exceed fifteen (15) double-spaced pages in length, within twenty-one (21) days of service of the motion.

6. **Motions:** Application to file any other motions shall be filed via JAMS Access and provided to the Arbitrator, by letter or email and shall contain a certification that the requesting Party has in good faith conferred with the opposing Party about the proposed motion. If no conference has occurred, the reason why must be stated. Formal motion procedure is not required.

7. **Dispositive motions based on disputed facts:** Parties are advised that it is unlikely that dispositive motions that require resolution of disputed facts, without a hearing, will be granted.

8. **Hearing:** In the original Demand for Arbitration Form, claimant requested a remote hearing. Whether the hearing is to be conducted remotely or in person shall be decided after the Pre-hearing Status Conference scheduled below, having due regard to claimant's request, the convenience of the parties and witnesses, the ability or inability to conduct the hearing via videoconference, and any relevant health considerations. A Final Hearing in this matter will commence before the Arbitrator on **November 1, 2022, at 9:30 a.m**. If conducted in person, the hearing will be held at JAMS Resolution Center in Clayton, Missouri. The Parties shall reserve two days—November 1st and 2nd—for hearing and argument, but this time period may be adjusted

2

after the Pre-hearing Status Conference scheduled below.  The hearing will be reset only upon good cause shown.

       **9.**       **Additional Pre-hearing/Status Conference:** An additional pre-hearing status conference call is scheduled for **September 28, 2022, at 10:00 a.m.** before the Arbitrator.  The Parties shall confer regarding a proposed agenda.

       **10.**     **Exchange of Information/Discovery:**

    a.  Initial Exchange of Information:

        i.  Pursuant to Rule 17, Parties shall cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information relevant to the dispute or claim by **June 30, 2022**;

    b.  Written Discovery:

        i.  Following the initial exchange of information as provided for in Rule 17, any other written discovery requests shall be exchanged by **July 8, 2022**.  Each Party may serve no more than five (5) requests for production of documents and no more than ten (10) interrogatories; and

        ii.  Answers to discovery requests are due within thirty (30) days of receipt of the requests.

    c.  Depositions to be completed by **August 31, 2022**.

        i.  Pursuant to Rule 17(b), one (1) deposition per Party;

        ii.  No deposition shall exceed five (5) hours in length; and

        iii.  With respect to all depositions, there shall be no speaking objections, or interference with the ability of counsel to elicit testimony from a witness, subject to privilege objections and instructions.

    iv.  Additional depositions may be allowed but only upon with the approval of the Arbitrator. Such depositions will only be approved if the movant makes a sufficient written demand justifying the need for the deposition.

  d.  Discovery cutoff is **August 31, 2022**.

  e.  Electronic Discovery: the Parties do not anticipate the discovery of much, if any, electronically stored information ("ESI") in this case sufficient to warrant a specific ESI case management order.

**11.**    **Confidentiality:** A Party may make a request to the Arbitrator for any measures required to protect confidential information.

**12.**    **Subpoenas:**

  a.  Pursuant to Rule 21, subpoenas to secure the appearance of non-party witnesses or documents at the hearing will be issued by the Arbitrator. The Party requesting the subpoena shall disclose the subpoena to and confer with all other Parties prior to requesting its issuance and shall indicate if any Party opposes the issuance. If any Party objects to issuance of the subpoena or the content of any subpoena, such objection shall be presented to the Arbitrator. Subpoenas for the attendance of witnesses at the hearing shall be submitted no later than thirty (30) days prior to the Final Hearing.

**13.**    **Witness Disclosures:**

  a.  Pursuant to Rule 20(a), Claimant shall file a disclosure of all witnesses reasonably expected to be called by Claimant by **August 31, 2022**.

  b.  Pursuant to Rule 20(a), Respondents shall file a disclosure of all witnesses reasonably expected to be called by Respondents by **August 31, 2022**.

c.  No expert testimony is anticipated in this proceeding.

**14.**   **Exhibits:** The Parties shall exchange copies of all exhibits to be offered and all schedules, summaries, diagrams, and charts to be used at the hearing no later than **September 23, 2022**.

a.  Each Party shall bring sufficient copies to the hearing for opposing Parties, the Arbitrator, and the witness.

b.  Each proposed exhibit shall be pre-marked for identification using the following designations: C1 through C_ for Claimant and R1 through R_ for Respondent.

**15.**   **Stipulation of Uncontested Facts:** The Parties shall file a stipulation of uncontested facts by **September 23, 2022**.

**16.**   **Pre-Hearing Briefs:** Pursuant to Rule 20(b), each Party may serve and file a pre-hearing brief on all significant disputed issues, setting forth briefly the Party's position and the supporting arguments and authorities.

a.  Briefs may be in summary form, including the use of bullet points rather than extensive text.

b.  The Arbitrator request that briefs not exceed ten (10) double-spaced pages, excluding copies of any authorities that the Parties may submit at the same time. The Parties are invited to highlight any authorities as they deem appropriate.

**17.**   **Stenographic Record:** As provided by Rule 22 of the Comprehensive Rules and Procedures:  "Any party may arrange for a stenographic record to be made of the Hearing and shall shall inform the other Parties in advance of the Hearing.  No other means of recording the hearing shall be permitted absent agreement of the Parties or by direction of the Arbitrator.  The requesting Party shall bear the cost of such stenographic record."

5

18.   **Award:**

    a.  Form of Award:

        i.  The form of the award shall be as required by the arbitration agreement;

        ii.  Pursuant to the Rules, the award shall be made by the Arbitrator no later than thirty (30) days from the date of closing the hearing;

        iii.  Each Party shall bear its own respective attorneys' fees and all other costs, unless otherwise provided by law and awarded by the Arbitrator; and

        iv.  The Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 24(f).

19.   **File Destruction:** The Arbitrator will destroy his files consistent with JAMS Document Retention Policy, which is attached.

Dated: May 20, 2022

                         s/ *Lawrence E. Mooney*

                        Hon. Lawrence E. Mooney (ret.)
                        Arbitrator

 # Document Retention Policy

Please note that **30 CALENDAR DAYS** after termination of any case JAMS will destroy the following documents submitted by parties unless parties specifically notify JAMS that they wish to collect their documents:

- **Briefs**
- **Exhibits**
- **Evidence**
- **Transcripts**

Parties should collect their documents as soon as possible after the termination of a case. Otherwise, they will be destroyed 30 days thereafter. Please note that JAMS does not maintain a duplicate file of documents, which are normally forwarded to the Neutral upon receipt. Any items marked with notes, comments or suggestions by the Neutral will automatically be destroyed upon closing of the file.

"Termination" of a case is defined as any of the following:

- **Resolution of a matter, e.g., either through settlement or issuance of an award**
- **Mutual agreement to close the matter**
- **Withdrawal from ADR Process**
- **Time Period of one year elapses without any resolution and no future dates on calendar**
- **Notice from JAMS that the matter has been terminated**

# JAMS ARBITRATION

IN THE MATTER OF:

| | |
|---|---|
| RICHARD SADDLER, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| CARVANA, LLC, BRIDGECREST | ) |
| ACCEPTANCE CORPORATION, and | ) |
| DRIVETIME AUTOMOTIVE | ) |
| GROUP, INC., | ) |
| | ) |
| Respondents. | ) |
| | ) JAMS Ref. No. 1440007303 |
| | ) |
| CARVANA, LLC, | ) Arbitrator: Hon. Lawrence E. Mooney |
| | ) |
| Counter-claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD SADDLER, | ) |
| | ) |
| Counter-claim Respondent. | ) |

## RESPONDENTS' REPLY TO RICHARD SADDLER'S RESPONSE TO DISCOVERY CONFUSION

By and through undersigned counsel, and pursuant to leave granted by the Arbitrator on August 23, 2022, Respondents, Carvana, LLC ("Carvana"), Bridgecrest Acceptance Corporation ("Bridgecrest"), and DriveTime Automotive Group, Inc. ("DriveTime") (collectively, "Respondents"), state as follows for their Reply to Claimant, Richard Saddler's ("Saddler"), August 21, 2022, Response to Discovery Confusion (the "Response"):[1]

---

[1] The Response is dated August 20, 2022, but it was submitted via email and JAMS Access on Sunday, August 21, 2022.

1.    On August 19, 2022, the Arbitrator directed Saddler to provide a detailed response to Respondents' August 18, 2022, correspondence, which detailed Saddler's failure to engage in discovery in this Arbitration, including direction to provide the reason, if any, he failed to respond to respond to Respondents' July 9, 2022, Written Discovery;

2.    Saddler's Response fails to provide any justification for his failure to respond to the Written Discovery. Instead, Saddler references his June 19, 2022, request for potential extra time to conduct depositions, and the Arbitrator's June 20, 2022, statement that he "can make changes to the discovery plan as the circumstances warrant;"

3.    Saddler did not request any modification of the discovery plan with regard to written discovery, which was due July 8, 2022, and, respectfully, the current circumstances do not warrant any such modification.[2]  Saddler failed to serve any written discovery, and he failed entirely, without justification, to respond to Respondents' Written Discovery; and

4.    Now, forty-four (44) days after his deadline to prepare and serve written discovery—which written discovery is expressly limited to five (5) requests for production and ten (10) interrogatories (Discovery Plan, Order No. 9, ¶ 10(b))—Saddler served twenty-eight (28) total interrogatories and ten (10) requests for admissions.  The Arbitrator should not permit Saddler's belated attempts to serve excessive and unauthorized written discovery.

WHEREFORE, Respondents respectfully request that the Arbitrator:

A.    order Saddler to respond to the Written Discovery in advance of his noticed August 29, 2022, deposition, the travel arrangements for which are in place;

B.    quash the excessive and unauthorized written discovery propounded by Saddler on August 21, 2022; and

---

[2] Respondents make reference to their August 12, 2022, Objection to Claimant's Request for Issuance of Deposition Subpoenas with regard to any request to modify the August 31, 2022, deposition deadline.

2

C.    award such other further and general relief that the Arbitrator deem just and appropriate.

This 23rd day of August, 2022.                    Respectfully submitted.

                                        s/ M. Thomas McFarland
                                        Christopher W. Cardwell
                                        M. Thomas McFarland
                                        **GULLETT SANFORD ROBINSON & MARTIN PLLC**
                                        150 Third Avenue South, Suite 1700
                                        Nashville, Tennessee 37201
                                        Phone: (615) 244-4994
                                        Facsimile: (615) 256-6339
                                        ccardwell@gsrm.com
                                        tmcfarland@gsrm.com

                                        *Counsel for Carvana, LLC, Bridgecrest Acceptance*
                                        *Corporation, and DriveTime Automotive Group, Inc*


## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2022, a true and correct copy of the foregoing **RESPONSE TO DISCOVERY CONFUSION** was served upon the following via JAMS Access and electronic mail:

    Richard Saddler
    413 Genoa Drive
    Manchester, MO 63021
    ricksaddler@yahoo.com
    richardsaddler@yahoo.com


                                        s/ M. Thomas McFarland

RE: [EXTERNAL] - Discovery answers and requested documents

From: Richard Saddler (richardsaddler@yahoo.com)

To: tmcfarland@gsrm.com; lmooney@jamsadr.com

Cc: tnoble@gsrm.com; ccardwell@gsrm.com

Date: Wednesday, October 5, 2022 at 10:29 PM CDT

I will be filing my answer to the motion for some judgment filed by the corporate parties tomorrow.

Sent from Yahoo Mail on Android

On Wed, Oct 5, 2022 at 7:27 PM, Thomas McFarland <tmcfarland@gsrm.com> wrote:

Judge Mooney:

I am now just waiting for final sign off and verification of the supplemental responses along with the production of any additional responsive documents, to the extent they exist.

Regards,



**Thomas McFarland**
**Gullett Sanford Robinson & Martin PLLC**
Main: 615.244.4994 | Direct: 615.921.4242
150 Third Avenue South, Suite 1700, Nashville, TN 37201
tmcfarland@gsrm.com | www.gsrm.com

**From:** Richard Saddler <richardsaddler@yahoo.com>
**Sent:** Wednesday, October 5, 2022 11:46 AM
**To:** Thomas McFarland <tmcfarland@gsrm.com>; 'Lawrence Mooney' <LMooney@jamsadr.com>
**Cc:** Tillie Noble <tnoble@gsrm.com>; Chris Cardwell <ccardwell@gsrm.com>
**Subject:** RE: [EXTERNAL] - Discovery answers and requested documents

It is my understanding that we will have all discovery by end of business then this Friday? Fair?

Sent from Yahoo Mail on Android

On Wed, Oct 5, 2022 at 11:35 AM, Thomas McFarland <tmcfarland@gsrm.com> wrote:

I hope to have them completed by the end of this week. Depositions yesterday and today in another matter have impeded this timeline. There are only a few details remaining that myself and my clients are trying to track down and finalize, and then finding the appropriate person within the organization to verify the responses, which may push it into early next week. The fact that these factual allegations occurred largely in 2018 is complicating this process.

**From:** Lawrence Mooney <LMooney@jamsadr.com>
**Sent:** Wednesday, October 5, 2022 11:32 AM
**To:** Thomas McFarland <tmcfarland@gsrm.com>; Richard Saddler <richardsaddler@yahoo.com>
**Cc:** Tillie Noble <tnoble@gsrm.com>; Chris Cardwell <ccardwell@gsrm.com>
**Subject:** Re: [EXTERNAL] - Discovery answers and requested documents

Dear Mr. McFarland,

Could you please provide an estimate of when you think this will be accomplished?

Very truly yours,

Hon. Lawrence Mooney (ret.)
Arbitrator

**From:** Thomas McFarland <tmcfarland@gsrm.com>
**Sent:** Wednesday, October 5, 2022 11:21 AM
**To:** Richard Saddler <richardsaddler@yahoo.com>

**Cc:** Tillie Noble <tnoble@gsrm.com>; Lawrence Mooney <LMooney@jamsadr.com>; Chris Cardwell <ccardwell@gsrm.com>
**Subject:** Re: [EXTERNAL] - Discovery answers and requested documents

**Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mr. Saddler:

I am working with my clients to compile and finalize those responses. As you are aware, the interrogatories request information related to dozens of individuals—many of whom are no longer employed by Carvana—and events over four years ago. We are compiling and finalizing that information with all deliberate speed as directed by the Arbitrator.

Regards,

Thomas McFarland

Sent from my iPad

On Oct 5, 2022, at 9:51 AM, Richard Saddler <richardsaddler@yahoo.com> wrote:

Mr. McFarland, I hope this message finds you well. Can you give me a date your client intends to respond to the discovery request and answer per Judge Mooney's orders?

If we don't get a date soon, Judge Mooney from council can you impose a date in the very near future in which answers must be received by?

Thank you in advance.

Sent from Yahoo Mail on Android

# Bridgecrest Arbitration Request (State Case)

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| BRIDGECREST ACCEPTANCE CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| RICHARD SADDLER, | ) ) | Cause No. 21SL-CC01705 |
| Defendant. | ) ) | Division: 12 |
| | ) ) | |
| RICHARD SADDLER, | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| CARVANA, LLC, SILVERROCK GROUP, INC., and DRIVETIME AUTOMOTIVE GROUP, INC. | ) ) ) ) | |
| Third-party Defendants. | ) ) | |

**BRIDGECREST ACCEPTANCE CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND EXTEND THE TIME TO RESPOND TO DEFENDANT'S THIRD PARTY COUNTER-COMPLAINT AND/OR STAY PROCEEDINGS PENDING A RULING ON ITS MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS PLAINTIFF'S CAUSE OF ACTION IN THE EVENT PLAINTIFF'S MOTION TO COMPEL ARBITRATION IS GRANTED**

By and through undersigned counsel, Plaintiff, Bridgecrest Acceptance Corporation ("Bridgecrest"), files this Memorandum of Law in Support of its Motion to Compel Arbitration and Extend the Time to Respond to Defendant's Third Party Counter-complaint and/or Stay Proceedings Pending a Ruling on its Motion to Compel Arbitration and Motion to Dismiss Plaintiff's Cause of Action in the Event Plaintiff's Motion to Compel Arbitration is Granted (the "Motion") filed on March 24, 2022, and states:

## I.   INTRODUCTION

This litigation arises out of Defendant, Richard Saddler's ("Saddler") purchase of a 2015 GMC Terrain sport utility vehicle, VIN 2GKFLZE35F6281225 (the "Vehicle") from Carvana, LLC ("Carvana").[1]  Despite previously being compelled to arbitration by the United States District Court for the Eastern District of Missouri, *Saddler v. Carvana, LLC*, No. 4:20CV105 HEA, 2020 U.S. Dist. LEXIS 143276 (E.D. Mo. Aug. 11, 2020), Bridgecrest instituted this litigation in error for the recovery of amounts owed on the purchase of the Vehicle.  Arbitration proceedings are underway before JAMS entirely encompassing these parties and this dispute.  This matter should be compelled to arbitration to preserve judicial economy and avoid inconsistencies in judgments.

## II.   FACTUAL AND PROCEDURAL HISTORY OF CASE

The factual and procedural history of this dispute is complex, but necessary for the Court's consideration of Bridgecrest's Motion.

### A.  Saddler Purchases The Vehicle From Carvana And Agrees To Arbitration.

Saddler purchased the Vehicle from Carvana in September 2018, which Carvana delivered to him on September 21, 2018. (Ver. Pet., attached as **Exhibit 1,** ¶ 8).  As part of the purchase process, Saddler executed, among others, a Retail Installment and Security Agreement (the "RIC") a Retail Purchase Agreement, and an Arbitration Agreement. (**Id.** at ¶ 9; Feb. 21, 2020, Dec. J. Brown, attached as **Exhibit 2,** ¶¶ 13–14, Ex. C).  Per the terms of the Arbitration Agreement, Saddler was entitled to reject the terms of the Arbitration Agreement by delivering written notice of such rejection to Carvana, which Saddler did not provide. (**Exhibit 2,** ¶ 19, Ex. C).

---

[1] Saddler purports to name Carvana, SilverRock Group, Inc. ("SilverRock"), and DriveTime Automotive Group, Inc. ("DriveTime") as third-party defendants.  No summons were issued to or served upon these entities.

2

## B. Saddler's Initial Litigation Against Carvana.

Saddler initially sued Carvana in this Court on May 13, 2019 in the action styled *Saddler v. Carvana, LLC*, Cause No. 19SL-CC01864 (the "First Action"). (Ver. Pet., **Exhibit 1**). Plaintiff's Verified Petition in the First Action stated two causes of action for fraud and violation of the Missouri Merchandising Practices Act ("MMPA"). (**Id.** at ¶¶ 19–29). Carvana removed the First Action to the Eastern District of Missouri, which remanded it after Saddler stipulated in open court that he was not seeking in excess of $75,000.00. (Jun. 18, 2019, ECF Order, attached as **Exhibit 3**).

Plaintiff refiled against Carvana in this Court on December 23, 2019, in the action styled *Saddler v. Carvana, LLC*, Cause No. 19SL-CC05679 (the "Second Action") asserting the same two causes of action and adding an additional five (5) counts to his Petition for (i) breach of contract; (ii) breach of the covenant of good faith and fair dealing; (iii) constructive fraud or negligent misrepresentation; (iv) unjust enrichment; and (v) negligent infliction of emotional distress all seeking compensatory and punitive damages and attorneys' fees. (Second Action Compl., attached as **Exhibit 4**). Carvana properly removed the Second Action to the Eastern District of Missouri Court on January 22, 2020, and then moved to compel the lawsuit to arbitration. On August 11, 2020, the Eastern District of Missouri compelled the litigation to arbitration, holding that the "Arbitration Agreement is in effect and requires arbitration of [Saddler's] claims." *Saddler*, 2020 U.S. Dist. LEXIS 143276, at *10.

## C. *Bridgecrest Files Suit, Saddler Initiates* Arbitration Proceedings And Concedes Entire Controversy *Should Be Compelled To And Consolidated In That Forum.*

Bridgecrest filed the instant action on April 15, 2021, seeking "the sum of $25,986.70, for interest thereon at the statutory rate of 9.00% per annum from and after the date of judgment, and court costs." (Pet., p. 2). Candidly, Bridgecrest's Petition in this litigation was filed in error, and

3

the Petition contained errors. Specifically the Affidavit attached to the Petition references DriveTime Car Sales Company, LLC, which had no involvement with the sale of the Vehicle. (Id. at Aff. M. Warren, ¶ 2). Bridgecrest determined that the Petition had been filed in error, and was in the process of remedying the situation by dismissing the Petition, but was unable to do so due to Saddler's various counter- and/or third-party claims. At all times, the contracts governing this dispute—along with Saddler's accompanying debt obligations—remained with Carvana.

On May 12, 2021, before Bridgecrest was able to serve Saddler with process in this proceeding,[2] Saddler instituted arbitration in the action styled, *Saddler v. Carvana, LLC*, JAMS Ref. No. 1440007303 (the "Arbitration"), asserting claims for: (i) breach of contract; (ii) statutory fraud; (iii) violations of the MMPA; (iv) breach of the covenant of good faith and fair dealing; (v) constructive fraud/negligent misrepresentation; (vi) unjust enrichment; and (vii) negligent infliction of emotion distress. (Saddler Dem. Arb., attached as **Exhibit 5**). The Honorable Lawrence E. Mooney, former Chief Judge for the Missouri Court of Appeals, Eastern District, is presiding over the Arbitration.

On January 14, 2022, Saddler filed a "Motion for Joinder" seeking to name Bridgecrest, SilverRock, and DriveTime as Respondents in the Arbitration. (Mot. Joinder, attached as **Exhibit 6**). Critically, Saddler concedes that: (i) his dispute with each of these parties "arise out of the same legal relationship(s)"; (ii) the contracts relevant to this dispute are related; and (iii) "[t]he dispute arises out of the same transaction or series of transactions." (**Id.** at ¶ 41). Arbitrator Mooney, relying on the express language of the Arbitration Agreement between Saddler and Carvana, granted the Motion for Joinder, holding:

---

[2] Bridgecrest served Saddler on May 21, 2021.

4

> These provisions compel my conclusion that claimant should be allowed to join the proposed respondents to this arbitration. The claims and entities appear to be within the contemplation of the claimant and [Carvana's] Arbitration Agreement.

(JAMS Order No. 6, attached as **Exhibit 7**, pp. 5–6).

## III.    THE COURT SHOULD COMPEL PLAINTIFF'S CASE TO ARBITRATION

The Court should compel this case to be consolidated with the Arbitration. As conceded by Saddler—and held by Arbitrator Mooney—this dispute lies "within the contemplation" of Saddler's agreement to arbitrate his claims with Carvana. Saddler entered into the Arbitration Agreement on September 21, 2018, and the entirety of this dispute falls within its substantive scope. Accordingly, the Court should compel this case to the Arbitration and either dismiss it entirely or stay it pending conclusion of that proceeding.

### A.  Standard For Compelling Arbitration.

"The issue of whether arbitration should be compelled is a question of law subject to *de novo* review." *State ex rel. Van Alst v. Harrell*, 528 S.W.3d 442, 445 (Mo. Ct. App. 2017) (quoting *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. banc 2014)). The Federal Arbitration Act ("FAA") "governs the applicability and enforceability of arbitration agreements in all contracts involving interstate commerce." *Id.* at 446 (quoting *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 431 (Mo. banc 2015) (noting that a contract between residents of the state of Missouri on the one hand and an out-of-state corporation registered to do business in Missouri "involves interstate commerce and is subject to the FAA").[3] Motions to compel arbitration require the court to consider: "(1) whether a valid arbitration agreement exists; (2) whether the dispute falls within the

---

[3] Saddler is a resident of the State of Missouri and Bridgecrest is an Arizona corporation registered to do business in the State of Missouri. The FAA "establishes a liberal federal policy favoring arbitration." *Leonard v. Del. North Cos. Sport Serv.*, No. 4:15-cv-1356-CDP, 2016 U.S. Dist. LEXIS 89295, at *4 (E.D. Mo. Jul. 11, 2016) (quoting *Torres v. Simpatico, Inc.*, 781 F.3d 963, 968 (8th Cir. 2015)).

scope of the agreement; and (3) whether applicable contract principles subject the agreement to revocation." *Id.*

## B. The Arbitration Agreement Is Valid.

The Arbitration Agreement is a valid agreement to arbitrate under Missouri law. Whether an agreement is valid under the FAA is "tested through a lens of ordinary state-law principles that govern contracts." *Eaton*, 461 S.W.3d at 432. As such:

> Missouri contract law applies to determine whether the parties have entered a valid agreement to arbitration. The essential elements of any contract, including one for arbitration, are offer, acceptance, and bargained for consideration. Consideration consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party.

*Van Alst*, 528 S.W.3d at 446 (quoting *Baker*, 450 S.W.3d at 775).

Saddler's verified Petition in the First Action, the Eastern District of Missouri's decision in the Second Action, and Arbitrator Mooney's Order No. 6 in the Arbitration all establish that the Arbitration Agreement is valid and enforceable. Indeed, the verified Petition concedes that at the time he received the Vehicle, "he signed final documents acknowledging and accepting delivery" and that the Arbitration Agreement was one of those final documents. (**Exhibit 1,** ¶¶ 8-9; *see also Saddler*, 2020 U.S. Dist. LEXIS 143276, at *9 (compelling arbitration while noting Saddler "does not argue the validity or enforceability of the Arbitration Agreement"). Simply put, there can be no dispute that the Arbitration Agreement satisfies the elements of offer and acceptance under Missouri law.

Further, valid consideration exists to support the Arbitration Agreement in the form of mutual promises to arbitrate. "It is an elemental principle of contract law that a contract that contains mutual promises imposing some legal duty or liability on each promisor is supported by sufficient consideration to form a valid, enforceable contract." *Clemmons v. Kan. City Chiefs*

6

*Football Club, Inc.*, 397 S.W.3d 503, 506 (Mo. Ct. App. 2013) (quoting *Frye v. Speedway Chevrolet Cadillac*, 321 S.W.3d 429, 438 (Mo. Ct. App. 2010)). "Therefore, if a contract contains mutual promises imposing a legal duty or liability 'on each party as a promisor to the other party as a promise, the contract is a bilateral contract supported by sufficient consideration.'" *Id.* (quoting *Frye*, 321 S.W.3d at 438). Here, the respective promises to arbitrate disputes was mutual, as the Arbitration Agreement states:

> We both agree that if we have a dispute, either of us can decide to resolve it by using arbitration. Arbitration is a formal process for resolving disputes without going to court. . . By choosing arbitration, we are both giving up our right to go to court (except small claims court) to resolve our dispute. In arbitration a neutral person, called an arbitrator, listens to both of us and decides how our dispute is resolved. Arbitrator decisions are enforceable, just like a court order. Unlike court orders, these decisions are subject to very limited review by a court. Once a decision is made it is final, except in very limited circumstances. In arbitration, we both give up our right to a judge or jury, and, as a result, there is no jury trial. . .

(Ex. A, p. 1). This language clearly and unequivocally imposes mutual promises upon both Saddler and Carvana, and is, therefore, a bilateral contract supported by adequate consideration.[4]

Put simply, Saddler acknowledged and agreed under oath that he entered into the Arbitration Agreement, and there is no allegation even referencing, much less questioning, its validity. Therefore, the Arbitration Agreement is valid, and the first prong of the requisite test is satisfied.

## C. **This Dispute Falls Within The Scope Of The Arbitration Agreement.**

The scope of the Arbitration Agreement encompasses Saddler's claims, particularly in light of the strong presumption in favor of arbitrability. *Kan. City Urology, P.A. v. United Healthcare Servs.*, 261 S.W.3d 7, 12 (Mo. Ct. App. 2008) ("Under federal law, arbitrability of a claim does not turn on whether or not the claim can be maintained without referring to the underlying contract

---

[4] Arbitrator Mooney relied upon the Arbitration Agreement's definitions of "Us/We/Our" and "Claim" to extend its provisions to Bridgecrest, DriveTime, and SilverRock. (**Exhibit 7**, p. 5).

but on whether or not the arbitration clause's scope is broad. A broad scope creates a strong presumption in favor of arbitrability, and the circuit court should order arbitration of any dispute that "touches" matters covered by the parties' contract.") (internal citations omitted). *Leonard*, 2016 U.S. Dist. LEXIS 89295, at *16 ("The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.")[5] "Where an arbitration clause is broad and contains no express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *State ex rel. Reg'l Convention & Sports Complex Auth. v. Burton*, 533 S.W.3d 223, 226 (Mo. 2017) (citing *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 429 (Mo. banc. 2003)).

Indeed, the Arbitration Agreement's scope is all-encompassing as it subjects all "Claims" to arbitration, which are defined as:

> [A]ny claim, dispute our [sic] controversy between you and us arising from or related to one or more of the following: (a) The Contract; (b) The vehicle or the sale of the vehicle; (c) The provision or sale of any goods and services like warranties, insurance and extended service contracts covered by the Contract or related to the vehicle; (d) The relationships resulting from the Contract; (e) Advertisements, promotions or oral or written statements related to the Contract; (f) The financing terms; (g) Your credit applications; (h) The origination and servicing of the Contract; (i) The collection of amounts you owe us; (j) Any repossession, or replevin, of the vehicle; (k) Your personal information; (l) The rescission or termination of the Contract. "Claim" has the broadest reasonable meaning. It includes claims of every kind of nature. This includes initial claims, counterclaims, cross-claims, third-party claims, statutory claims, contract claims, negligence and tort claims (including claims of fraud and other intentional torts).

---

[5] Under the FAA, opinions of the U.S. Supreme Court are binding upon Missouri state courts, which also consider lower federal court decisions "for their aid and guidance." *Kan. City Urology*, 261 S.W.3d at 11 (citing *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 171 (Mo. Ct. App. 2006)).

(Ex. A., p. 2).[6] A cursory review of third-party claims Saddler purports to plead reveals that they fall well within the scope of the broad, all-encompassing provisions of the Arbitration Agreement. *See Leonard v. Del. North Cos. Sport Serv.*, No. 4:15-cv-1356-CDP, 2016 U.S. Dist. LEXIS 89295, at **16-17 (citing *PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 836-37 (8th Cir. 2010) (finding arbitration clause covering "all disputes arising under" the agreement was "generally broad" in scope and holding that arbitration may be compelled "as long as the underlying factual allegations simply touch matters covered by the arbitration provision"). Indeed, as recognized by the Missouri Court of Appeals in *Kan. City Urology*, arbitration provisions such as those in the Arbitration Agreement are "the paradigm of a broad clause." 261 S.W.3d at 12 (citing *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)). Arbitrator Mooney's ruling in the Arbitration joining Bridgecrest, SilverRock, and DriveTime to that proceeding comports with these decisions.

In sum, it is clear that all of the claims at issue in this litigation constitute "Claims" for purposes of the Arbitration Agreement, and therefore this dispute falls within its scope and should be arbitrated.

## D. **No Contract Principles Subject the Arbitration Agreement to Revocation.**

The third prong of Missouri's test for arbitrability of the Arbitration Agreement may be dealt summarily as no principles – contract or otherwise – would subject the Arbitration Agreement to revocation.[7] *See Saddler*, 2020 U.S. Dist. LEXIS 143276, at *7 ("[Carvana] never

---

[6] The Arbitration Agreement defines "Contract" as the RIC that Saddler agreed to and executed as part of the process of purchasing the Vehicle. A copy of the RIC is included at Exhibit C to Mr. Brown's Declaration.

[7] In fact, Saddler was given the option to "opt out" and reject the Arbitration Agreement within thirty (30) days of executing same. He declined to do so. (**Exhibit 2, ¶ 19**).

9

received any notice from [Saddler] that [Saddler] wanted to opt out of the Arbitration Agreement, which was an option that was available to [Saddler].")

## E. **The Court Should Dismiss this Proceeding Pending Arbitration.**

This Court should dismiss this litigation pending arbitration. In *Reg'l Convention*, the Missouri Supreme Court upheld the trial court's dismissal of the petitioner's petition after compelling the matter to arbitration pursuant to the parties' agreement to arbitrate. 533 S.W.3d at 225, 227. As in *Reg'l Convention*, Saddler's intent to arbitrate his disputes – including those at issue here – is "clear" and dismissal is appropriate. *Id.* As such, the Petition should be dismissed and this matter conclusively decided in the Arbitration.[8]

## IV.    **CONCLUSION**

In conclusion and for the reasons stated above, the Court should compel this case to arbitration and dismiss this action.

---

[8] Bridgecrest recognizes competing authority stating a stay is appropriate. *See Dotson v. Dillard's, Inc.*, 472 S.W.3d 599, 608 n.6 (Mo. Ct. App. 2015) (citing *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 804 n.2 (Mo. banc 2015)). However, the facts of this matter are analogous to *Reg'l Convention*, which controls. Should this Court disagree, this matter should be stayed.

10

Respectfully submitted

/s/ William A. Brasher
William A. Brasher, #30155
**REIFERS HOLMES & PETERS, LLC**
1010 Market Street, Suite 950
St. Louis, Missouri 63101
P: (314) 621-7700
F: (314) 621-1088
wbrasher@rhpfirm.com

*and*

Christopher W. Cardwell, #49583
M. Thomas McFarland, #033432TN
**GULLETT SANFORD ROBINSON & MARTIN, PLLC**
150 Third Avenue South, Suite 1700
Nashville, TN 37201
P: (615) 244-4994
F: (615) 256-6339
ccardwell@gsrm.com
tmcfarland@gsrm.com

***Attorneys for Bridgecrest Acceptance Corporation***

**IN THE CIRCUIT COURT OF SAINT LOUIS COUNTY, MISSOURI**
**ASSOCIATE CIRCUIT DIVISION**

| | |
|---|---|
| BRIDGECREST ACCEPTANCE ) <br> CORPORATION, an Arizona ) <br> Corporation, ) <br> ) <br>      **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> RICHARD SADDLER, an individual, ) <br> ) <br>      **Defendant.** ) <br> ) <br> **and** ) <br> ) <br> RICHARD SADDLER, an individual, ) <br> ) <br>      **Third-Party Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> CARVANA, LLC, a Delaware Limited ) <br> Liability Company, and ) <br> SILVERROCK AUTOMOTIVE INC., ) <br> an Arizona Corporation, and ) <br> DRIVE TIME AUTOMOTIVE GROUP, ) <br> INC., an Arizona Corporation, ) <br> ) <br>      **Third-Party Defendants.** ) | **FILED** <br><br> APR 2 5 2022 <br><br> JOAN M. GILMER <br> CIRCUIT CLERK, ST LOUIS COUNTY <br><br><br> CASE NO. 21SL-CC01705 |

**DEFENDANT RICHARD SADDLER'S OBJECTION TO PLAINTIFF BRIDGECREST**
**ACCEPTANCE CORPORATION'S MOTION TO COMPEL ARBITRATION**

     NOW COMES Defendant/Third-Party Plaintiff, Richard Saddler, representing

himself as a Pro Se litigant, hereby objects to Bridgecrest Acceptance Corporation's Motion to

Compel Arbitration and states as follows:

## I. BACKGROUND

Saddler had filed a prior suit against Carvana in The Circuit Court of Saint Louis Missouri – case number 19SL-CC05679 – which Carvana removed to the United States District Court in case number 4:20CV105 HEA, wherein the Court issued an Order on August 11, 2020 which granted Carvana's Motion to Compel Arbitration and Dismissed case number 4:20CV105 HEA.

On April 15, 2021, Bridgecrest filed the pending Petition in the instant matter. Paragraph 2 of the Petition alleges that Bridgecrest and Richard Saddler entered into a written contract. This paragraph also states that a copy of the written contract is attached as Exhibit A (Exhibit 1). The contract is only signed by Richard Saddler and Carvana. It is the retail installment agreement for the purchase of the vehicle that is the basis of the complaint that Plaintiff filed in case number 4:20CV105 HEA.

Richard Saddler did not sign a contract with Bridgecrest that contained an arbitration clause or otherwise require arbitration to settle any dispute.

In the instant counterclaim, Richard Saddler as a Third Party Plaintiff alleged that Carvana as a Third Party Defendant committed fraud all across the country selling cars without titles. In addition, Carvana illegally sold cars without being a dealer in the State of Missouri, which is a statutory requirement.

Richard Saddler will submit proof that Carvana has sold motor vehicles in numerous jurisdictions, including Missouri without the legal authority to do so. Carvana believes that they can commit fraudulent sales with impunity.

Saddler believes, when Carvana sells a car, they automatically have Bridgecrest approve

the Buyer for financing, even though there is no contractual agreement as in this case between

buyer (Saddler) and seller (Carvana) or lender (Bridgecrest).

"After this court compelled Saddler's claims to arbitration, Saddler failed to take any

steps to institute arbitration proceedings as provided for in the relevant Arbitration Agreement,

and, eventually, Bridgecrest instituted an action in Missouri State Court (in the above styled

case) on April 15, 2021, seeking damages for Saddler's breach of the retail installment contract

***between Carvana and Saddler*.**" (*Bridgecrest Memo in Support of Motion to Compel*

*Arbitration, p, 8*)

Bridgecrest admitted by the above quote that there is no contractual relationship directly

or even indirectly between Richard Saddler and Bridgecrest. The above quote is evidence that

Bridgecrest is nothing more than a "puppet" of Carvana's fraudulent behavior which is described

above. The above quote proves that Carvana is pulling the "strings" which caused the April 15,

2021 filing of the instant matter and is now pulling more "strings" in attempting to force Richard

Saddler into arbitration in Bridgecrest's frivolous and unwarranted filing.

Since there is no contract between Bridgecrest and Richard Saddler that contains an

arbitration clause, the motion to compel has to be denied.

"The Federal Arbitration Act (FAA) evinces a liberal policy favoring arbitration

agreements so that disputes might be resolved without resort to the courts. *Greenwood v.*

*Sherfield,* 895 S.W.2d 169, 173 (Mo.App.1995). Before a party may be compelled to arbitrate

under the FAA, a court must determine whether a valid agreement to arbitrate exists between the

parties and whether the specific dispute falls within the substantive scope of that

agreement. *Houlihan v. Offerman & Co., Inc.,* 31 F.3d 692, 694-95 (8th Cir. 1994). A court must compel arbitration if it determines that the parties agreed to arbitrate the dispute. *Id.* at 695.

"The usual rules and canons of contract interpretation govern the subsistence and validity of an arbitration clause. *Village of Cairo v. Bodine Contracting Co.,* 685 S.W.2d 253, 258 (Mo.App.1985). Whether a dispute is covered by an arbitration provision is relegated to the courts as a question of law. *Drake Bakeries, Inc. v. Local 50,* 370 U.S. 254, 256, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962)." *Dunn Indus. Group v. City of Sugar Creek*, 112 SW 3d 421, 427-428 (2003)

"Arbitration is a matter of contract, and a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate. *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 242 F.3d 777, 780 (8th Cir.2001). *Grundstad v. Ritt,* 106 F.3d 201, 204 (7th Cir.1997)" *Id.*, at 435

In *Netco Inc. v. Dunn,* 194 SW 353, 361 (2006), our Supreme Court stated that "[I]t would be manifestly inequitable to permit [plaintiff] to both claim that [the non-signatory party] is liable to [plaintiff] for its failure to perform the contractual duties described in the agreement and at the same time deny that [the non-signatory] is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause. *Hughes Masonry Co., Inc. v. Greater Clark County School Bldg. Corp., 659 F.2d 836, 838-39 (7th Cir. 1981"*

"Furthermore, to the extent these appellants contend that they should be allowed to compel arbitration under the related theory that the claims against them are 'inextricably intertwined with those against Pro Net,' that theory is inconsistent with the overarching rule that arbitration is ultimately a matter of agreement between the parties. *See Dunn,* 112 S.W.3d at 436." *Id.*, at 361-362.

Wherefore, Saddler prays for Relief as follows:

a.      Deny plaintiffs request based on their filling they have waived their ability to ask for arbitration. This case should be sent back to the federal courts due to their actions.

b.      This case should be stayed until the findings of the current arbitration have been determined.

c.      This case should proceed on with case management due to the fraud claims that have been brought before this court against plaintiff and all corporate defendants.

d.      Defendant should be allowed to recover all costs associated with this filing by plaintiff.

e.      Dismiss Bridgecrest Petition and rule in favor of Defendant.

Respectfully submitted,

Richard Saddler
Plaintiff, *Pro Se*
*413 Genoa Drive*
*Manchester, MO 63021*
*Cell: 310-428-2110*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Process Server and or emailed, and or certified US Postal Service to the registered agents or Representatives listed below on this 22nd day of April 2022.

_____
RICHARD SADDLER

<u>RECIPIENTS SERVED ARE AS FOLLOWS:</u>
**Plaintiff:** BRIDGECREST ACCEPTANCE CORPORATION,
Attention; attorney Scott Rabin, 15280 Metcalf Ave, Overland Park, KS 66223

**Third Party Defendant:** CARVANA, LLC,
Attention; attorney Tom McFarland (tmcfarland@gsrm.com)

**Third Party Defendant:** DRIVETIME AUTOMOTIVE GROUP INC,
Certified mail to: 8825 N 23rd AVE, Suite 100, Phoenix, AZ 85021

**Third Party Defendant:** SILVERROCK GROUP INC,
By Process Server to their Statutory Agent: Corporation Service Company, 8825 N 23rd Avenue, Suite 100, Phoenix, AZ 85021

# Consumer Standards

**IN THE MATTER OF:**          )
                               )
  **Richard Saddler,**         )
                               )
              **Claimant,**    )
                               )
**vs.**                        )          **JAMS Ref. No 1440007303**
                               )
**Carvana LLC,**               )
                               )
              **Respondent.**  )

## Order No. 5

Before us today is the question whether this is a consumer arbitration and whether the JAMS Policy on Consumer Arbitration Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness (hereinafter "Policy on Minimum Standards") applies. As noted in Order No. 1, the parties agreed that this is a threshold issue that should be resolved.

By letter of May 20, 2021, Christopher Brancato of JAMS notified the parties to this arbitration as follows:

"JAMS has received a Demand for Arbitration in the above-referenced matter.

Upon review of the parties' pre-dispute arbitration agreement JAMS has determined that JAMS Policy on Consumer Arbitration Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness applies.

Please carefully review the enclosed Minimum Standards as JAMS requires that the parties comply with them in order to proceed.

The Minimum Standards will apply notwithstanding any contrary provisions in the parties' pre-dispute arbitration agreement. The parties' agreement to proceed constitutes agreement to the foregoing.

Any further issue about whether the Minimum Standards apply should be directed to the arbitrator once he or she is appointed. After hearing from the parties, if the arbitrator believes JAMS should revisit the issue, the arbitrator may advise JAMS accordingly. JAMS will then review the issue, taking the arbitrator's position into consideration, and will make a final determination."

The Claimant and the Respondent-Counterclaimant submitted letter briefs explaining their positions.  Order No. 4 allowed the briefs to be supported by affidavits in support of disputed factual issues.  The parties were also invited to submit relevant arguments and caselaw.

Respondent-Counterclaimant submitted no affidavits or caselaw, but it did attach an exhibit to their letter brief that included the five-page arbitration agreement.  Claimant submitted no affidavits or caselaw but attached an exhibit C, which was a transcript of an argument in federal court.   Claimant also requested that counsel for Respondent-Counterclaimant be sanctioned under Federal Rule 11.

Claimant argues that obviously he qualifies as a consumer in a consumer transaction.  He asserts he bought a vehicle from respondent for his personal use. Respondent is in the business of selling vehicles.

Let me address the two arguments advanced by Respondent-Counterclaimant in asserting that this is not a consumer arbitration and that the Policy on Minimum Standards should not apply.

First, Respondent-Counterclaimant argues that this is not "an arbitration clause within a separate agreement." Instead, it is a "separate stand-alone agreement between Carvana and Claimant." I think it commendable that a consumer is presented with the question of arbitration in a separate document because it might allow greater reflection on the sometimes-critical decision whether to choose arbitration. But this is hardly a "separate stand-alone agreement." To the contrary, the arbitration agreement submitted makes clear references to retail purchase agreements and security agreements signed in connection with the transaction. Claimant apparently was presented with a series of documents at the same time. Further, JAMS has announced that its policy applies "where a company systematically places an arbitration clause in its agreements with consumers and there is minimal, if any, negotiation between the parties as to the procedures or other terms of the arbitration clause." The fact that the arbitration might be memorialized in a separate document rather than a clause does not affect the policy.

Second, Respondent-Counterclaimant argues that the opt-out provision of the arbitration agreement should negate application of the Policy on Minimum Standards. Respondent-Counterclaimant boldly argues that "Claimant had the utmost ability to negotiate the terms of the Arbitration Agreement." I would be amazed if Respondent-Counterclaimant ever negotiated the terms of its arbitration agreement. In any event, there is no factual evidence offered in support of this argument. Yes, the Claimant could have opted out of arbitration, but that is far from "the utmost ability to negotiate the terms of the Arbitration Agreement." The mere fact that a careful consumer might have been able to use an opt-out process does not cure the uneven playing field caused by the routine use of clauses in consumer transactions.

I would call the parties' attention to Freeman v. SmartPay Leasing, LLC, No. 18-10380 (11th Cir. May 3, 2019). I recognize that this case has an arbitration agreement that is distinct from that of the Freeman opinion. But in this case, like

Freeman, the consumer is led to believe that any dispute will be administered by entities, whether JAMS or the American Arbitration Association, that believe enforcement of the fee provisions as written fails the minimum standard of fairness.

I conclude this is a consumer arbitration and the JAMS Policy on Consumer Arbitration Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness applies.

Lastly, let me address Claimant's aggressive request that counsel for Respondent-Counterclaimant be sanctioned pursuant to Federal Rule 11. I venture no opinion on whether I have that authority. But if I do, there is nothing sanctionable in the arguments that counsel has advanced. This is an adversarial process and I find no fault in the conduct of counsel.

Dated: January 7, 2022

/s/ *Lawrence E. Mooney*

Hon. Lawrence E. Mooney (Ret.)
Arbitrator



GULLETT SANFORD
ROBINSON & MARTIN PLLC

M
F
W GSRM.COM

January 6, 2022

**<u>FILED VIA JAMS ACCESS</u>**

Honorable Lawrence Mooney
LMooney@jamsadr.com

Re:   *Saddler v. Carvana, LLC*, JAMS Reference No. 1440007303

Dear Judge Mooney:

At the outset, I apologize for the belated filing of this letter brief as provided for in Order No. 4.  Yesterday I was concluding a two-day bench trial in Tennessee state court and mistakenly believed that the instant filing was due by 5:00 p.m. CST today, January 6, 2022.  This oversight is entirely my own, and I respectfully request that you accept this letter brief as filed.

Turning to the substance of Respondent, Carvana, LLC's ("Carvana') request for which leave was granted via Order No. 4, this proceeding does not qualify for application of the JAMS Consumer Arbitration Minimum Standards (the "Consumer Standards"), which provide, in relevant part:

> These standards are applicable where a company systematically places an arbitration clause in its agreements with individual consumers and there is minimal, if any, negotiation between the parties as to the procedures or other terms of the arbitration clause. . .

JAMS, Consumer Arbitration Minimum Standards (July 15, 2009), *available at* https://www.jamsadr.com/consumer-minimum-standards/ (last accessed January 6, 2022).

The Consumer Standards do not apply to this arbitration, because the requirements for their application are not present.  First, Carvana does not, and did not in this instance, place an arbitration clause within a separate agreement with Claimant, Richard Saddler ("Claimant").  Carvana's Arbitration Agreement, a copy of which is attached hereto as **Exhibit A**, is a separate stand-alone agreement between Carvana and Claimant.  Claimant signed the five-page Arbitration Agreement on September 21, 2018.  Critically, the Arbitration Agreement commences with the following Notice of Arbitration Agreement:

Hon. Lawrence Mooney
January 6, 2022
Page 2

## NOTICE OF ARBITRATION AGREEMENT

We both agree that if we have a dispute, either of us can decide to resolve it by using arbitration. Arbitration is a formal process for resolving disputes without going to court. If you want to learn more about arbitration, please navigate to the following links in your browser:

- http://info.adr.org/consumer-arbitration/
- https://www.jamsadr.com/adr-arbitration

If you wish, **you can decide to opt out and reject this arbitration agreement**, but to reject this arbitration agreement you will need to follow the instructions under the heading "Your Right to Reject this Agreement". You will need to act in the next 30 days or you lose your right to reject this arbitration agreement. It is your choice.

By choosing arbitration, we are both giving up our right to go to court (except small claims court) to resolve our dispute. In arbitration a neutral person, called an arbitrator, listens to both of us and decides how our dispute is resolved. Arbitrator decisions are enforceable, just like a court order. Unlike court orders, these decisions are subject to very limited review by a court. Once a decision is made it is final, except in very limited circumstances.

In arbitration, we both give up our right to a judge or jury, and, as a result, there is no jury trial. However, if either of us elects to use small claims court to resolve the dispute, the dispute will be resolved in small claims court rather than arbitration.

If you or we choose arbitration, only our individual claims will be arbitrated. Claims by groups of individuals or "Class" arbitrations, are not allowed. By choosing to arbitrate, you will be giving up your right to participate in a class action or a private attorney general action in court or in arbitration with respect to the dispute.

Arbitration rules are generally simpler and more limited than court rules. If you want to learn more about the rules and how they work, navigate to the following link in your browser:

- https://www.adr.org/sites/default/files/Consumer_Rules_Web.pdf
- https://www.jamsadr.com/rules-streamlined-arbitration/

The Arbitration Agreement also explains what the fees and costs for the arbitration will be, and who will pay them.

This is only a summary. As with all legal agreements, please read the entire agreement carefully before you sign. **Unless you opt out of the Arbitration Agreement, it will substantially affect your rights in the event of a dispute between you and us.**

(**Exhibit A**, p. 1).  As clearly indicated, Claimant had the unequivocal right to opt out of and reject the Arbitration Agreement.  (**Id.**)  The Arbitration Agreement goes on to provide the instructions by which Claimant could have opted out of arbitrating his disputes with Carvana, as follows:

> **Your Right to Reject this Agreement.   You have the right to reject this Agreement, in which event neither you nor we will have the right to require arbitration of any Claims.   Rejection of this Agreement will not affect any other aspect of your Contract.   In order for you to reject this Agreement, we must receive a signed writing ("Rejection Notice") from you within 30 days of the day you enter into the Contract, stating that you reject the Agreement. Any notice received after 30 days from the Contract date will not be accepted.**

Hon. Lawrence Mooney
January 6, 2022
Page 3

> **The Rejection Notice must include your name, address and Vehicle Identification Number (VIN) and must be mailed to us at:** <u>Attn: Carvana Legal, 1930 W Rio Salado Pkwy, Tempe, AZ 85281</u> **and must be sent via certified mail, return receipt requested.  Upon receipt of your Rejection Notice, we will refund your postage cost up to $6.70.  We will not refund postage costs for late notices.  If the Rejection Notice is sent on your behalf by a third party, such third party must include evidence of his or her authority to submit the Rejection notice on your behalf.  If you reject this Agreement, that will not constitute a rejection of any prior arbitration agreement between you and us.**

(**Id.** at p. 2).  Contrary to the requirements of the Consumer Standards, Claimant had the utmost ability to negotiate the terms of the Arbitration Agreement.  He could reject it entirely without any penalty or consequence.  He chose not to do so.  As a result, this proceeding does not qualify for application of the Consumer Standards.

Furthermore, the Arbitration Agreement provides that Carvana will bear administrator and/or arbitrator fees up to $2,500.00 on behalf of Claimant, if Claimant requests Carvana do so in writing.  (**Id.** at p. 3).  The Arbitration Agreement goes on to provide that Carvana will bear administrator and/or arbitrator fees in excess of $2,500.00 ("Additional Fees") if such a request is made in good faith by the Claimant.  (**Id.**)  Claimant failed to exercise these rights, just as he failed to exercise his right to unequivocally reject the Arbitration Agreement.

Put simply, the Consumer Standards—including its requirement that Carvana bear all JAMS Case Management Fees and arbitrator professional fees—are intended to protect consumers where a provision to arbitrate is hoisted upon them and otherwise buried within a contract of adhesion.  That is simply not the case at bar.  Claimant had the ability to reject the Arbitration Agreement entirely and he failed to do so.  As such, the Consumer Standards do not apply to this arbitration, and the parties should bear its costs and expenses equally.

Lastly, undersigned counsel feels it necessary to respond to Claimant's invocation of Federal Rule of Civil Procedure 11 in his January 5, 2022, Response to Order No. 4 as such an allegation is a serious one.  Even assuming that the Federal Rules apply to the instant proceeding, any request for sanctions pursuant to Rule 11(c) should be denied.  Procedurally, Claimant failed to satisfy the requirements of Rule 11(c)(2) that: (i) a request for sanctions be made separately from any other motion; (ii) that it be served under Rule 5, but not filed or presented, for twenty-one (21) days to provide an opportunity for the challenged paper, claim, defense, contention, or denial to be withdrawn or appropriately corrected.  Substantively, Claimant's request should be denied as he fails to establish the violation of any representation set forth in Rule 11(b).  Indeed, the points set forth in this letter brief establish that Carvana's position is not a frivolous one.

Hon. Lawrence Mooney
January 6, 2022
Page 4

Very truly yours,

**s/ *M. Thomas McFarland***

M. Thomas McFarland

cc:     Richard Saddler (via email: ricksaddler@yahoo.com)
        Lauren Smith, Case Manager (via email: LSmith@jamsadr.com)

# EXHIBIT A

DocuSign Envelope ID: 12B3F82E-9E3D-44EC-A7B2-753077B21742
Case: 4:23-cv-00150-HEA Doc. #: 1-21 Filed: 02/09/23 Page: 46 of 136 PageID #: 288
THIS IS A COPY
of a copy and is not the Authoritative Copy h
by the designated custodian

**ARBITRATION AGREEMENT**

## NOTICE OF ARBITRATION AGREEMENT

We both agree that if we have a dispute, either of us can decide to resolve it by using arbitration. Arbitration is a formal process for resolving disputes without going to court. If you want to learn more about arbitration, please navigate to the following links in your browser:

- http://info.adr.org/consumer-arbitration/
- https://www.jamsadr.com/adr-arbitration

If you wish, **you can decide to opt out and reject this arbitration agreement**, but to reject this arbitration agreement you will need to follow the instructions under the heading "Your Right to Reject this Agreement". You will need to act in the next 30 days or you lose your right to reject this arbitration agreement. It is your choice.

By choosing arbitration, we are both giving up our right to go to court (except small claims court) to resolve our dispute. In arbitration a neutral person, called an arbitrator, listens to both of us and decides how our dispute is resolved. Arbitrator decisions are enforceable, just like a court order. Unlike court orders, these decisions are subject to very limited review by a court. Once a decision is made it is final, except in very limited circumstances.

In arbitration, we both give up our right to a judge or jury, and, as a result, there is no jury trial. However, if either of us elects to use small claims court to resolve the dispute, the dispute will be resolved in small claims court rather than arbitration.

If you or we choose arbitration, only our individual claims will be arbitrated. Claims by groups of individuals or "Class" arbitrations, are not allowed. By choosing to arbitrate, you will be giving up your right to participate in a class action or a private attorney general action in court or in arbitration with respect to the dispute.

Arbitration rules are generally simpler and more limited than court rules. If you want to learn more about the rules and how they work, navigate to the following link in your browser:

- https://www.adr.org/sites/default/files/Consumer_Rules_Web.pdf
- https://www.jamsadr.com/rules-streamlined-arbitration/

The Arbitration Agreement also explains what the fees and costs for the arbitration will be, and who will pay them.

This is only a summary. As with all legal agreements, please read the entire agreement carefully before you sign. **Unless you opt out of the Arbitration Agreement, it will substantially affect your rights in the event of a dispute between you and us.**

"Us/We/Our" means Carvana, any purchaser, assignee or servicer of the Contract, all of their parent companies, and all subsidiaries, affiliates, predecessors and successors, and all officers, directors and employees of any of the forgoing. "Us/We/Our" also means any third party providing any product or service in connection with or incidental to the Contract, the sale of the vehicle and/or other goods or services covered by the Contract and/or related to the vehicle, if such third party is named as a co-defendant with us in a Claim you assert. "Us/We/Our" have these meanings only for this Agreement. This Agreement is part of, and is hereby incorporated into, the Contract. However, whenever in this Agreement the term "Contract" is used, it does not include this Agreement.

"You/Your" means you and/or any of your heirs or personal representatives.

"Contract" means the Retail Purchase Agreement (in Texas, the Buyer's Order) and/or the related Retail Installment Contract and Security Agreement (in California, Conditional Sales Contract and Security Agreement) you signed with us in connection with this purchase, and any prior Retail Purchase Agreement (in Texas, Buyer's Order) and/or Retail Installment Contract and Security Agreement (in California, Conditional Sales Contract and Security Agreement) that you previously had with us.

DocuSign Envelope ID: 12B3F82E-9E39-44FC-A782-753077B24742

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

"Agreement" means this Arbitration Agreement.

"Including" and "includes" means "including but not limited to."

This Agreement describes how a Claim may be arbitrated instead of litigated in court.

"Claim" means any claim, dispute our controversy between you and us arising from or related to one or more of the following:

(a) The Contract.

(b) The vehicle or the sale of the vehicle.

(c) The provision or sale of any goods and services like warranties, insurance and extended service contracts covered by the Contract or related to the vehicle.

(d) The relationships resulting from the Contract.

(e) Advertisements, promotions or oral or written statements related to the Contract.

(f) The financing terms.

(g) Your credit applications.

(h) The origination and servicing of the Contract.

(i) The collection of amounts you owe us.

(j) Any repossession, or replevin, of the vehicle.

(k) Your personal information.

(l) The rescission or termination of the Contract.

"Claim" has the broadest reasonable meaning. It includes claims of every kind of nature. This includes initial claims, counterclaims, cross-claims, third-party claims, statutory claims, contract claims, negligence and tort claims (including claims of fraud and other intentional torts). However, notwithstanding any language in this Agreement to the contrary, a "Claim" does not include a dispute about validity, enforceability, coverage or scope of this Agreement (including, without limitation, the paragraph below captioned "No Class Actions or Private Attorney General Actions," the final sentence under the paragraph below captioned "Miscellaneous" and/or this sentence); any such dispute is for a court, and not an arbitrator to decide. This exclusion from the definition of a "Claim" does not apply to any dispute or argument that concerns the validity or enforceability of the Contract as a whole; any such dispute or argument is for the arbitrator, not a court, to decide.

Even if you and we elect to litigate a Claim in court, you or we may elect to arbitrate any other Claim, including a new Claim in that lawsuit or any other lawsuit. Nothing in that litigation waives any rights in this Agreement.

However, notwithstanding any language in this Agreement to the contrary, the term "Claim" does not include (i) any self-help remedy, such as repossession or sale of any collateral given by you to us as security for repayment of amounts owed by you under the Contract; or (ii) any individual action in court by one party that is limited to preventing the other party from using such self-help remedy and that does not involve a request for damages or monetary relief of any kind. Also, we will not require arbitration of any individual Claim you make in small claims court or your state's equivalent court, if any. If, however, you or we transfer or appeal the Claim to a different court, we reserve our right to elect arbitration.

**Your Right to Reject this Agreement. You have the right to reject this Agreement, in which event neither you nor we will have the right to require arbitration of any Claims. Rejection of this Agreement will not affect any other aspect of your Contract. In order for you to reject this Agreement, we must receive a signed writing ("Rejection Notice") from you within 30 days of the day you enter into the Contract, stating that you reject the Agreement. Any notice received after 30 days from the Contract date will not be accepted. The Rejection Notice must include your name, address and Vehicle Identification Number (VIN) and must be mailed to us at: Attn: Carvana Legal, 1930 W Rio Salado Pkwy, Tempe, AZ 85281 and must be sent via certified mail, return receipt requested. Upon receipt of your Rejection Notice, we will refund your postage cost up to $6.70. We will not refund postage cost for late notices. If the Rejection Notice is sent on your behalf by a third party, such third party must include evidence of his or her authority to submit the Rejection Notice on your behalf. If you reject this Agreement, that will not constitute a rejection of any prior arbitration agreement between you and us.**

THIS IS A COPY
This is a copy of the Authoritative Copy held by the designated custodian

DocuSign Envelope ID: 12B3F82E-9E39-44FC-A7B2-753077B24742

<u>Selection of Arbitration Administrator</u>. Unless prohibited by applicable laws, any Claim shall be resolved, on your election or ours, by arbitration under this Agreement.

You may select as the administrator either of the organizations listed at the end of this Agreement. If we want to arbitrate, we will tell you in writing. That may include a motion to compel arbitration that we file in court. You will have 20 (twenty) days to select the administrator (or, if you dispute our right to require arbitration of the Claim, 20 (twenty) days after that dispute is finally resolved). If you do not choose an administrator within the 20-day period, we will do so.

If for any reason the administrator is unable, unwilling, or ceases to be the administrator, you will have 20 (twenty) days to choose the other organization listed at the end of this Agreement. If you do not select a new administrator within that period, we will do so. If neither organization is willing or able to be the administrator, then the administrator will be selected by the court. Notwithstanding any language in this Agreement to the contrary, no arbitration may be administered, without the consent of all parties to the arbitration, by any administrator that has in place a formal or informal policy that is inconsistent with the paragraph below captioned "No Class Action or Private Attorney General Action."

If a party files a lawsuit in court asserting Claim(s) that are subject to arbitration and the other party files a motion to compel arbitration with the court which is granted, it will be the responsibility of the party prosecuting the Claim(s) to commence the arbitration proceeding.

<u>Location of Hearing</u>. Any arbitration hearing you attend shall be in the federal judicial district of your residence.

<u>No Class Action or Private Attorney General Action</u>. Notwithstanding any language herein to the contrary, if you or we elect to arbitrate a Claim, neither you nor we will have the right to: (1) participate in a class action in court or in arbitration, either as a class representative, class member or class opponent; (2) act as a private attorney general in court or in arbitration, or (3) join or consolidate your Claim(s) with claims of any other person; and the arbitrator shall have no authority to conduct any such class, private attorney general or multiple-party proceeding. This paragraph does not apply to any lawsuit filed against us in court by a state or local government agency even when such agency is seeking relief on behalf of a class of buyers/borrowers including you. This means that we will not have the right to compel arbitration of any claim brought by such an agency.

<u>Notice and Cure; Special Payment</u>: Prior to initiating a Claim, you may give us a written Claim Notice describing the basis of your Claim and the amount you would accept in resolution of the Claim, and a reasonable opportunity, not less than 30 days, to resolve the Claim. If (i) you submit a Claim Notice in accordance with this Paragraph on your own behalf (and not on behalf of any other party); (ii) you cooperate with us by promptly providing the information we reasonably request; (iii) we refuse to provide you with the relief you request; and (iv) the arbitrator subsequently determines that you were entitled to such relief (or greater relief), you will be entitled to a minimum award of at least $7,500 (not including any arbitration fees and attorneys' fees and costs to which you will also be entitled).

<u>Fees and Expenses</u>. An arbitration administrator and arbitrator may waive or reduce its fees for financial hardship. If you ask in writing, we will pay all administrator and arbitrator fees up to $2,500 that the administrator will not waive for any Claims you assert in good faith.

We will consider in good faith your request to pay all or part of any administrator or arbitrator fees over $2,500 ("additional fees"). To the extent we do not approve your request, if the arbitrator issues an award to you, we will still pay you for additional fees you must pay the administrator and/or arbitrator as follows:

(1) In the case of additional fees based on the amount of your Claim or the value of the relief you sought, we will pay you an amount equal to the fees you would have paid if the amount of your Claim or the value of the relief you sought had been the amount or value of the award to you.
(2) In the case of other additional fees not based on the amount of your Claim or the value of the relief you sought, we will pay you for the amount of such additional fees.
(3) If we are required to pay any greater sums under applicable law or in order for this Agreement to be enforced, we will pay such amounts.

DocuSign Envelope ID: 12B3F82E-9E39-44EC-A7A2-753077B24748

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

We will bear the administrator and arbitrator fees we are normally required to pay and will also bear the expense of our attorneys, experts and witnesses, except where applicable law and the Contract allow us to recover attorneys' fees and/or court costs in a collection action we bring. You will bear the expense of your attorneys, experts and witnesses if we prevail in an arbitration. However, in an arbitration you commence, we will pay your reasonable fees if you prevail or if we must bear such fees in order for this Agreement to be enforced. Also, we will bear any fees if applicable law requires us to.

<u>Applicable Law, Award of Arbitrator and Right to Appeal.</u> Because the Contract involves a transaction in interstate commerce, the Federal Arbitration Act ("FAA") governs this Agreement. The arbitrator shall apply applicable substantive law consistent with the FAA. The arbitrator shall apply applicable statutes of limitations. The arbitrator is authorized and given the power to award all remedies that would apply if the action were brought in court. Either party may make a timely request for a brief written explanation of the basis for the award. The arbitrator shall not apply federal or state rules of civil procedure or evidence.

Judgment on the arbitrator's award may be entered in any court with jurisdiction. Otherwise, the award shall be kept confidential.

The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $50,000 or involves a request for injunctive or declaratory relief that could foreseeably involve a cost or benefit to either party exceeding $50,000, any party can appeal the award to a three-arbitrator panel administered by the administrator, which panel shall reconsider any aspect of the initial award requested by the appealing party. The decision of the panel shall be by majority vote. Reference in this Agreement to "The arbitrator" shall mean the panel of arbitrators if an appeal of the arbitrator's decision has been taken. The costs of such an appeal will be borne in accordance with the paragraph captioned "Fees and Expenses" above.

<u>Miscellaneous</u>. This Agreement survives payment of all amounts you owe, if any, under the Contract. It also survives your bankruptcy and any sale by us of your Contract.

If there is a conflict or inconsistency between the administrator's rules and this Agreement, this Agreement governs. If there is a conflict or inconsistency between this Agreement and the Contract, this Agreement governs. If a court or arbitrator deems any part of this Agreement invalid or unenforceable under any law or statute consistent with the FAA, the remaining parts of this Agreement shall be enforceable despite such invalidity. However, if a court limits or voids any part of the above paragraph captioned "No Class Actions or Private Attorney General Actions" in any proceeding, then this entire Agreement (except for this sentence) shall be null and void with respect to such proceeding, subject to the right to appeal such limitation or voiding.

This Agreement (if you do not reject) will supersede any prior arbitration agreement between you and us with respect to any Claim.

THIS IS A COPY

**BY SIGNING BELOW, YOU EXPRESSLY AGREE TO THE ABOVE AGREEMENT. THE AGREEMENT MAY SUBSTANTIALLY LIMIT YOUR RIGHTS IN THE EVENT OF A DISPUTE. YOU ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT.**

_Richard Saddler_

_____
Customer Signature

_____
Customer Signature

By: _____
Authorized Signature

Date: _____ 09/21/18 _____

COPY VIEW

**ARBITRATION ADMINISTRATORS**

If you have a question about the administrator mentioned in this Agreement or if you would like to obtain a copy of their arbitration rules or fee schedules, you can contact them as follows:

American Arbitration Association (AAA)
13455 Noel Road, Suit 1750
Dallas, TX 75240-6620
www.adr.org

J.A.M.S./Endispute
700 11th Street, NW, Suite 450
Washington, DC 20001
www.jamsADR.com
(800) 352-5267

IN THE MATTER OF:                        )
                                         )
Richard Saddler,                         )
                                         )
                Claimant,                )
                                         )
vs.                                      )        **JAMS Ref. No 1440007303**
                                         )
Carvana LLC,                             )
                                         )
                Respondent               )


## Order No. 13

    Claimant has requested an extension of time to file dispositive motions. He filed this request on September 16, 2022. Order No. 9, which was issued on May 20, 2022, established the plan of discovery. That order specified that dispositive motions were to be filed on or before September 16, 2022. Respondent opposes the extension of time to file dispositive motions although it also asked, if the extension were to be granted to Claimant, that it also be granted to Respondent. Claimant's request comes at the 11th hour. Further, in Order No. 9, I cautioned the parties of my wariness as to the use of dispositive motions when the underlying facts are disputed. When the facts are disputed, they should be resolved at a hearing, which is set for November 1st and 2nd of this year. In this arbitration, there are numerous disputed facts. Moreover, we have a hearing scheduled in the near future.

    Given these circumstances, I DENY Claimant's request for an extension of time to file dispositive motions. I further DENY Respondent's conditional request for an extension of time to file dispositive motions.


    **So ordered.**


September 16, 2022                        s _Lawrence E. Mooney_
                                         Lawrence E. Mooney
                                         Arbitrator
                                         JAMS



**JAMS Ref. No 1440007303**

| | |
|---|---|
| **IN THE MATTER OF:** | ) |
| | ) |
| **Richard Saddler,** | ) |
| | ) |
| **Claimant,** | ) |
| | ) |
| **vs.** | )   **JAMS Ref. No 1440007303** |
| | ) |
| **Carvana LLC,** | ) |
| | ) |
| **Respondent.** | ) |

## Order No. 14

I have reviewed the Respondents' Motion for Summary Judgment and Supporting Memorandum and Claimant's Response.

## Confusion about pleadings

In Claimant's deposition, Claimant requested clarification of the status of pleadings. I dealt with this matter in Order No. 12. In that Order I concluded:

> **"I ACCEPT the filing of the Third Amended Complaint Against All Respondents filed by Claimant on July 25, 2022. However, I STRIKE from that Complaint the listing of Ernie Garcia II, Ernie Garcia III, and Mary Phillips, as Respondents. I further STRIKE from that Complaint its Count 1 of Civil Conspiracy. I DENY Claimant's Motion for Leave to Amend filed on July 25, 2022."**

I denied leave to amend  as proposed by Claimant because Claimant improperly sought to add parties and a cause of action that I had not authorized. Thus, I denied Claimant's Motion for Leave to Amend. However, I accepted the filing of the Third Amended Complaint. I did so subject to important holdings. I struck the improper parties and improper cause of action. This then leaves us with the following causes of action and parties for resolution:

Count 1 – Breach of Contract (Carvana and Bridgecrest);

Count 2 – Statutory Fraud (Carvana);

Count 3 – Violations of the Missouri Merchandising Practices Act (Carvana and Bridgecrest);

Count 4 – Violation of the Covenant of Good Faith and Fair Dealing (Carvana, Bridgecrest, and DriveTime);

Count 5 – Constructive Fraud/Negligent Misrepresentation (Carvana);

Count 6 – Unjust Enrichment (Carvana and Bridgecrest); and Count 7 – Negligent
Infliction of Emotional Distress (Carvana, Bridgecrest, and DriveTime)

## **Motion for Summary Judgment or Disposition**

Respondents have filed a Motion for Summary Judgment, which I will refer to as
Motion for Summary Disposition since we are in arbitration rather than litigation. Order No. 9
cautioned: "Parties are advised that it is unlikely that dispositive motions that require resolution
of disputed facts, without a hearing, will be granted." In reviewing the parties' submissions, I
conclude, somewhat reluctantly, that the muddled state of the record prevents the grant of
summary disposition as to any cause of action or any party.

Let me explain. The submissions included the deposition of the Claimant, who denies
execution of the documents that Respondents claim govern this dispute. Without a conclusive
record of what promises were exchanged by the parties, I cannot determine the resolution of any
cause of action or the liability of any party because I do not yet know what the controlling
documents are. Respondents have proffered a set of documents they say govern the matter.
Claimant testified to a "wet ink" set of documents but did not acknowledge that this set of "wet
ink" documents would mirror those proffered by respondents. Nor did Claimant proffer this
"wet ink" set of documents in his submission. Summary-judgment practice forbids the use of
credibility determinations and inference-drawing to "fill in the holes" necessary to achieve
resolution. The due-process clause reserves such determinations to a fact-finder at trial or, in our
case, arbitration hearing. **I DENY Respondents Motion for Summary Judgment**.

Nevertheless, I appreciate the parties' efforts to narrow the matter and want to offer
comments to focus the parties' efforts.

First, I need to understand Claimant's contentions. Does Claimant argue that his set of
"wet-ink" documents differs the those submitted by Respondents as to the documents' terms and
conditions? Or does Claimant argue that respondents' submitted documents differ from his set
of "wet-ink" documents only in the manner of how the signatures are evidenced? If Claimant
wishes to clarify his argument in advance of the Hearing, he may do so by filing a statement of
his position.

Second, I offer some guidance to the parties on the assumption that the documents
presented by the parties materially differ ONLY in the manner of signature. (If in fact the parties
submitted documents materially differ from each other, I'll need to determine which documents I
credit and the following observations may not be relevant.)

Respondents assert that the Retail Purchase Agreement should be governed by Georgia
law and the Retail Installment Contract and Arbitration Agreement should be governed by
Missouri law. I disagree. For two distinct reasons, the Retail Purchase Agreement should also
be governed by Missouri law.

The first reason that Georgia law does not apply to the Retail Purchase Agreement is because the Retail Installment Contract and Security Agreement, which also purports to govern the purchase of the vehicle, states that Missouri law applies. Let's look at the documents' wording. The Retail Purchase Agreement purports to be governed by Georgia law. The Retail Installment Contract and Security Agreement specifies it shall be governed by Missouri law as to state-law issues. Confusingly, this document under "Additional Terms of the Sales Agreement" states that "You agree to purchase the Property from Seller…. You also agree that the purchase of the Property on credit takes place at [Georgia]." Thus, both the Retail Purchase Agreement and the Retail Installment Contract and Security Agreements assert they govern the purchase of the vehicle by their very terms. But the purchase must be governed by the laws of a single state, even if evidenced in two different documents.

The second reason that Georgia Law doesn't not apply to the Retail Purchase Agreement is because the choice-of-law principles law require that Missouri law should govern. Generally, Missouri courts uphold the parties' choice unless the designation is contrary to the public policy of a jurisdiction which has a materially greater interest. [See Richard J. Ansson Jr., "How Have the Missouri Courts Employed the Second Restatement of Conflicts to Tortious and Contractual Issues?" Saint Louis University Law Journal, Volume 44, Number 2, Spring 2000.] Here, Missouri has a substantially greater interest than Georgia in securing that vehicles on Missouri roads are properly titled. [See, for example, State ex rel. Geil v. Corcoran, 623 S.W.2d 555 (Mo. Ct. App. 1981), a case finding Missouri had a substantially greater interest in enforcing its Blue Sky laws despite a contrary choice-of-law provision.]

Although I have denied Respondents' Motion for Summary Disposition due to the present uncertainty of what agreements the parties executed, I caution the Claimant that I have yet to see evidence sufficient to establish the liability of Bridgecrest or DriveTime. The fact that an entity may be a third-party beneficiary of a contract, as Claimant argues, does not render a third-party beneficiary liable to suit. A third-party beneficiary may sue on a contract, but that does not mean it may be sued on a contract.

October 10, 2022

/s/ Lawrence E. Mooney

Hon. Lawrence E. Mooney (Ret.)
Arbitrator
JAMS

**IN THE CIRCUIT COURT OF SAINT LOUIS COUNTY, MISSOURI**
**ASSOCIATE CIRCUIT DIVISION**

**FILED**

BRIDGECREST                          )
ACCEPTANCE CORPORATION,              )          JAN 0 9 2023
an Arizona Corporation,              )
                                     )          JOAN M. GILMER
                                     )          CIRCUIT CLERK, ST LOUIS COUNTY
        Plaintiff,                   )
                                     )
v.                                   )          **CASE NO. 21SL-CC01705**
                                     )
 RICHARD SADDLER, an                 )
individual,                          )
                                     )
        Defendant,                   )
                                     )
and                                  )
                                     )
RICHARD SADDLER, an                  )
Individual,                          )
                                     )
        Third Party Plaintiff,       )
                                     )
v.                                   )
                                     )
CARVANA, LLC, a Delaware             )
Limited Liability Company, and       )
                                     )
SILVERROCK AUTOMOTIVE                )
INC., an Arizona Corporation, and    )
                                     )
DRIVE TIME AUTOMOTIVE                )
GROUP, INC., an Arizona              )
Corporation,                         )
                                     )
        Third Party Defendant(s). '  )

1

## MOTION FOR SANCTION AGAINST ALL OPPOSING PARTIES AND THEIR LEGAL COUNSEL

NOW COMES Defendant/Third-Party Plaintiff, Richard Saddler ("Saddler"),

representing himself as a Pro Se litigant, hereby files his Motion for Sanctions against all

Opposing Parties and their Legal Counsel pursuant to Missouri Supreme Court Rule 55.03, and

states as follows:

### BRIEF BASIS OF REQUEST FOR SANCTIONS

1.   The facts and procedure that is stated below show that this case was filed for an improper and/or fraudulent purpose.

2.   The actions of all opposing parties, by and through their legal counsel, have abused the legal process in filing this case against Saddler.

3.   Their actions have caused the Circuit Court of St. Louis County, the Judge and their office staff, and the Clerk's office to expend numerous hours and financial resources based upon the desire to punish a pro se litigant for being a whistleblower against Carvana, Bridgecrest, DriveTime and SilverRock.

4.   Since Saddler's initial filing against Carvana in the Circuit Court of St. Louis Missouri, case number 19SL-CC05679, the floodgates have opened with filings throughout numerous state jurisdictions across the country.

5.   Saddler is requesting at minimum, that this Court exercise its own initiative to enter an order describing the specific conduct that violates Rule 55.03(c) and sanction all Opposing Parties and their Legal Counsel in an appropriate manner.

2

## I. BACKGROUND

6.   Saddler purchased a 2015 GMC Terrain Denali (the "Vehicle") from Carvana, which was delivered on September 21, 2018.

7.   Saddler made his monthly payments from the date of delivery on September 21, 2018 through October 2019, both online and at a DriveTime location in South County, St. Louis. In October 2019, a representative from Bridgecrest informed Saddler that his account was current. After Saddler sent the payment for November 2019, however, Bridgecrest returned that payment and blocked his ability to pay his bill online.

8.   Saddler had filed a prior suit against Carvana in the Circuit Court of St. Louis Missouri, case number 19SL-CC01864 and case number 19SL-CC05679. Carvana removed these cases to the United States District Court, case number 4:20CV105 HEA, wherein the Court issued an Order on August 11, 2020 granting Carvana's Motion to Compel Arbitration. Such case was subsequently dismissed.

9.   Bridgecrest filed the instant matter against Saddler on April 15, 2021 for a Breach of a Retail Installment Agreement.

10.   To the best of Saddler's belief and knowledge, Carvana, Bridgecrest, DriveTime and SilverRock are all owned by the same people and/or entities. Ernest Garcia II is the owner of DriveTime and largest shareholder of Carvana, owning 44.46% of the shares as of June 13, 2022. His son, Ernest Garcia III, is the CEO of Carvana. These two individuals co-founded Carvana and own a supermajority of Carvana shares of stock. They also own Bridgecrest and SilverRock.

11.   Each of these entities is represented by the same legal counsel(s) in the cases involving Saddler.

3

## II. IMPROPER AND/OR FRAUDUALENT BASIS

12.   In the instant case, Bridgecrest filed suit against Sadder, alleging, by affidavit, that DriveTime owned the Vehicle. *(Exhibit A)*

13.   Based upon Bridgecrest's filing, Saddler filed a Motion to Remove to the U.S. District Court, case number 4:21-cv-01096-JCH.

14.   In response, Bridgecrest filed a Motion to Remand (Exhibit B, p 4, para 1 of Memo). In such motion, Bridgecrest admitted that there was an improper basis to file the instant matter, wherein it stated that "After this court compelled Saddler's claims to arbitration, Saddler failed to take any steps to institute arbitration proceedings as provided for in the relevant Arbitration Agreement, and, eventually, Bridgecrest instituted the instant action in Missouri state proceedings...."

15.   Bridgecrest knew arbitration was scheduled in this matter as both Bridgecrest and Carvana are represented by the same counsel.

16.   After remand was granted in open court, Bridgecrest's counsel informed this Court that it filed this action against Saddler in error, as opposed to what it claimed in Federal District Court. So this was the second contradictory explanation, made by Bridgecrest to mislead this Court.

17.   On May 26, 2021, Bridgecrest mailed a copy of a Motion for Leave to Amend and attached as an Exhibit was the First Amended Petition for Replevin and Money Judgment. *(Exhibit C)*

18.   Exhibit C shows that Bridgecrest knew that it did not file the suit in error, which is especially true given that all parties have been and still are represented by the same legal counsel.

4

19.     On November 1, 2022, the Arbitrator held a full hearing between the parties.

20.     At the hearing, Carvana testified that Carvana owned the Vehicle and that the Vehicle is the property of Carvana. Such allegation is evidenced by the Post Arbitration Hearing Memorandum, wherein Attorney McFarland argues that Carvana has a security interest in the Vehicle that Saddler purchased from Carvana. *(Exhibit D, p. 9)*

21.     In Exhibit D at page 12, Attorney McFarland requests that the Arbitrator dismiss DriveTime from the Arbitration as being a non-party.

22.     As stated above, however, Bridgecrest already claimed that DriveTime owns the Vehicle. *(Exhibit A)*

23.     On several occasions, Bridgecrest, through their counsel, Attorney Thomas McFarland, has made different explanations as to why it filed this lawsuit against Saddler. Each of these different explanations conflict for the purpose of his client depending on the day and the client.

24.     These explanations show not only that Bridgecrest, through their counsel – Thomas McFarland, filed the case in retaliation against Saddler, but also to commit fraud against the Court and our legal system.

25.     As stated above, Bridgecrest pleaded in a United States District Court that "After this court compelled Saddler's claims to arbitration, Saddler failed to take any steps to institute arbitration proceedings as provided for in the relevant Arbitration Agreement, *and, eventually, Bridgecrest instituted the instant action in Missouri state proceedings . . ." (Exhibit B, p 4, para 1 of Memo)*

5

26. The above-referenced statement evidences that Bridgecrest *had absolute knowledge that the matters contained in its lawsuit had already been ordered to arbitration* by a Federal District Court.

27. From the statement in Exhibit B, it is obvious that Bridgecrest, through Council, filed the instant matter for an improper purpose.

28. As stated above, after remand was granted in open Court, Attorney McFarland informed this Court that they filed their action against Saddler in error.

29. Exhibit C[1] shows, however, that Council intended to file an Amended Complaint on behalf of Bridgecrest. Council actually made no attempt to file these pleadings with the court; however, Council sent me a copy of the pleadings and never actually filed such pleadings.

30. The original petition that Council filed with the court and the amended petition which was never filed with the Court still affirmatively assert that DriveTime was the owner of the Vehicle.

31. Not only have the filings stated that DriveTime owns the Vehicle, but preparing these pleadings with this false information and not filing the amended pleadings in court is evidence of the fraud that Defendants and Attorney McFarland are attempting to perpetrate on this court.

32. Between what they have stated in pleadings and testified to in arbitration, this Court can see there is a conflict as to the statements regarding who presently owns the Vehicle – Carvana or DriveTime.

---

[1] Saddler would note that after serving Saddler with a copy of Exhibit C, Attorney McFarland failed to file this pleading with the Court.

6

33. Since Attorney McFarland represents each and every opposing party, it is obvious that each party had actual or constructive knowledge that the Federal case against Carvana had been ordered to arbitration and the case was dismissed. However, Attorney McFarland still wrongfully filed suit in the present matter on behalf of Bridgecrest.

34. The facts establish that the Bridgecrest filing was for an improper purpose, thus perpetrating a fraud on the Court.

## III. OTHER JURISDICTIONS

35. The bad and fraudulent acts by Defendants, as alleged in this motion, are not limited to Saddler or to this case. Indeed, Defendants have been sued across the country to additional bad and fraudulent acts.

36. In the United States District Court for the Eastern District of Pennsylvania, case number 5:21-cv-05400-EGS, an "Amended Complaint – Class Action" was filed on January 13, 2022. *(Exhibit G)* This suit alleges that Carvana has done acts that are the same and/or similar to what Saddler has alleges. *(Exhibit E, Section I, Page 3 & 4)* Judge Edward Smith *denied* Carvana's motion to Compel Arbitration and Motion to Dismiss Plaintiff's Petition. *(Exhibit F)*

37. All of Exhibit E details twenty-six (26) individuals who have suffered the same issues as Saddler in this case.

38. In the facts alleged in that case, some of the individuals were provided with temporary tags issued from up four (4) different US states.

39. In Exhibit E, it is alleged that "Carvana's failure to timely register cars as it promised and received money to do – sometimes for a period exceeding two (2) years - causes

7

consumers to be questioned and sometimes arrested by law enforcement while
driving the temporarily registered cars." *(Exhibit G, p 1)*  The Complaint states,
"Rather than correct its routine business practice when confronted by its consumer
customers, Carvana has resorted to a myriad of dubious excuses for its dilatory
conduct including blaming COVID and administrative logjams caused by state
departments of motor vehicle administration and its third-party vendors to whom
Carvana sub-contracts the registration process post-sale." *(Exhibit G p 1-2)*

40.     The North Carolina Department of Motor Vehicles (NCDMV) also sued Carvana,
        claiming that Carvana failed to deliver titles to the department, sold a motor vehicle
        without a state inspection, and issued out-of-state temporary tags/plates for a vehicle
        sold to a person in North Carolina. On August 2, 2021, NCDMV and Carvana agreed
        to a settlement whereby Carvana's North Carolina Dealers License was revoked for a
        period of 180 days.

41.     The State of Florida also filed an administrative complaint, citing Carvana's
        Jacksonville location and Carvana's CEO, Earnest C. Garcia III, for failing to transfer
        titles within 30 days, as Florida law requires. The administrative complaint named
        twelve Florida consumers who had been impacted by Carvana's failure to timely
        transfer titles. In September 2021, CARVANA was ordered to pay a $6,000 fine.

42.     In another suit, in August 2021, the State of California and Carvana settled a lawsuit
        that had been filed in Los Angeles County, California, and Carvana agreed to pay a
        fine of $850,000 for operating in California without a dealer's or transporter's license.
        Carvana had been selling cars to California consumers since 2015 but did not obtain a
        dealer's license until May 2019; beginning in September 2017, Carvana delivered

8

numerous cars to California customer using its own delivery vehicles but had no

transporter's license.

43.    In another suit, in May 2021, the State of Michigan fined Carvana $2,500 for seven

violations of state rules for vehicle dealers, including improperly issuing temporary

registrations. Carvana also agreed to18 months' probation, during which the state can

suspend or revoke their license to sell cars if it fails to comply with Michigan law.

44.    In addition, in October 2021, the State of Texas fined Carvana for more than $10,000

regarding titling and other documentation issues.

45.    Defendants have a history of fraudulent behavior.

## IV. LAW AND ARGUMENT

46.    Missouri Supreme Court Rule 55.03 provides in part that:

(c) **Representation to the Court.** By presenting and maintaining a claim, defense, request, demand, objection, contention, or argument in a pleading, motion, or other paper filed with or submitted to the court, an attorney or party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that:

(1) The claim, defense, request, demand, objection, contention, or argument is not presented or maintained for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) The claims, defenses, and other legal contentions therein are warranted existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law

(d) **Sanctions.** If after notice and a reasonable opportunity to respond the court finds that Rule 55.03(c) has been violated, the court, subject to the conditions below, may impose an appropriate sanction upon the lawyers, law firms, or parties that have committed or are responsible for the violation.

(1) How Initiated.

...

(B) On Court's Initiative. and directing a lawyer, law firm or party to withdraw or correct the questioned claim, defense, request, demand, objection, contention or argument or to show cause why it has not violated the rule with respect thereto.

9

47.   In State Ex Rel. Accurate Const. v. Quillen, 809 SW 2d 437, 440 (Mo.App.E.D. 1991), the Court discussed the Court electing to consider, on their own initiative, sanctions under Rule 55.03 stating that "Under Rule 55.03, there are basically three types of submitted papers which warrant sanctions: factually frivolous (not "well grounded in fact"); legally frivolous (not "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law"); and papers "interposed for any improper purpose." *See Business Guides v. Chromatic Com. Enterprises,* 892 F.2d 802, 808 (9th Cir.1989). Rule 55.03 also requires that a "reasonable" prefiling inquiry be conducted into the law and facts. The rule imposes an *objective* standard of conduct. *Id.*" The papers submitted by Defendants show that factually frivolous and submitted for an improper purpose.

48.   In Camden v. Matthews, 306 SW 3d 680, 682-3 (Mo.App.S.D. 2010), the Court affirmed the trial court's order granting sanctions where the defendants had filed a motion to dismiss the plaintiffs' claims. While the motion was still pending, plaintiff filed a voluntary dismissal and then four days later re-filed the same action against the same defendants. The court allowed sanctions, as it was clear the plaintiff was fraudulent wasting the court's time and attempting to circumvent the law and rules of court.

49.   The facts here are similar to Camden in that Saddler filed a case against Carvana, which was referred to Arbitration and dismissed. Then, because Bridgecrest, which is a separate entity controlled by Carvana and DriveTime, believed that Saddler was "dragging his feet" with respect to Arbitration, Bridgecrest filed this case. The filing

10

of this case can be seen as nothing except retaliatory, just as admitted by counsel in the filing, previously quoted.

50. As the court allowed sanctions in Camden, sanctions should be allowed here as well. Defendants are merely attempting to fraudulent waste the court's time and trying to circumvent the law and rules of court. Defendants knew the lawsuit was not filed in error. Defendants are simply attempting to harass Saddler and circumvent the rules, just as they try to do in every other jurisdiction in which they are sued. Defendants show a history and repeated fraudulent behavior, and they should not be able to get away with such a blatant disregard of the rules in Missouri or the rules of court.

## III. CONCLUSION

Therefore, this Court should order as follows:

a) Grant Sanctions pursuant to Missouri Supreme Court Rule 55.03 at minimum on this Court's own initiative or based on supported facts and conduct here in.

b) Order sanctions as follows: Strike Bridgecrest's pleadings with prejudice in the instant matter and award Saddler his costs in defending this matter to be determined, and

c) Any other relief that this Court deems necessary.

Respectfully submitted,

Richard Saddler,
*Pro Se*
413 Genoa Drive
Manchester, MO 63021
Cell: 310-428-2110

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by email, to all Corporate Parties Council on this 9th day of January 2023.

RICHARD SADDLER
*Pro Se*
413 Genoa Drive
Manchester, MO 63021
Cell: 310-428-2110

12

## IN THE CIRCUIT COURT OF SAINT LOUIS COUNTY, MISSOURI
## ASSOCIATE CIRCUIT DIVISION

| | |
|---|---|
| **BRIDGECREST  ACCEPTANCE** ) | |
| **CORPORATION, an Arizona** ) | |
| **Corporation,** ) | |
| ) | **FILED** |
| Plaintiff, ) | |
| ) | APR 2 5 2022 |
| ) | JOAN M. GILMER |
| **RICHARD SADDLER, an individual,** ) | CIRCUIT CLERK. ST LOUIS COUNTY |
| ) | |
| Defendant. ) | |
| ) | |
| and ) | **CASE NO. 21SL-CC01705** |
| ) | |
| **RICHARD SADDLER, an individual,** ) | |
| ) | |
| **Third-Party Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **CARVANA, LLC, a Delaware Limited** ) | |
| **Liability Company, and** ) | |
| ) | |
| ) | |
| **ORENO HOLDINGS, LLC on behalf of** ) | |
| **SILVERROCK GROUP, INC., and** ) | |
| **Arizona Corporation, and** ) | |
| ) | |
| **DRIVE TIME AUTOMOTIVE GROUP,** ) | |
| **INC., an Arizona Corporation,** ) | |
| ) | |
| **Third-Party Defendants.** ) | |

## DEFENDANT'S  ANSWER AND THIRD-PARTY COUNTER COMPLAINT

NOW COMES Defendant, Richard Saddler, representing himself as a Pro Se litigant,

hereby files his Answer and Counter Complaint to Plaintiff, Bridgecrest Acceptance

Corporation's Petition and states as follows:

1

I.

## **GENERAL DENIAL**

1. Subject to such stipulations and admissions as may hereafter be made, Defendant asserts a general denial as authorized under the rules. Defendant respectfully requests that Plaintiff be required to prove the charges and allegations against this Defendant by a preponderance of the evidence as is required by the Constitution and laws of the State of Missouri.

2. With respect to the prayer contained in the Plaintiff's Petition, Defendant denies that any of the alleged acts or omissions and denies that Plaintiff is entitled to recover any damages or any other relief.

3. Any and all allegations not specifically admitted above are generally denied.

II.

## **SPECIFIC DENIAL**

4. Defendant admits paragraph ONE of Plaintiffs Petition that this Court has original jurisdiction to hear this matter.

5. Defendant denies paragraph TWO of Plaintiff's Petition that Plaintiff and Defendant entered into a written contract.

6. Defendant denies paragraph THREE of Plaintiff's Petition that Plaintiff performed as agreed.

7. Defendant denies paragraph FOUR of Plaintiff's Petition that Defendant breached the contract.

8. Defendant denies paragraph FIVE of Plaintiffs Petition.

2

III.

## DEFENSES AND AFFIRMATIVE DEFENSES

9.  By pleading the following defenses, as provided for pursuant to Missouri Rules of Civil Procedure, Defendant does not concede that it possesses or assumes the burden to prove each or any of them. Defendant maintains that Plaintiff retain the burden of proof on all matters necessary to state and sustain the claims asserted in their Original Petition.

IV.

## AFFIRMATIVE DEFENSES

10. Plaintiff has failed to state a claim for which relief may be granted.

11. Plaintiffs have failed to exhaust administrative remedies for some or all of their claims.

12. Defendant denies Plaintiffs are entitled to recover any damages or other relief; in the alternative, upon information and belief, Plaintiffs' damage claims are barred in whole or part by reason of their failure to mitigate their alleged damages and/or the doctrine of after-acquired evidence; further, in the alternative, to the extent Plaintiffs have mitigated their damages, Defendant is entitled to a credit or set-off.

V.

## RESERVATION OF RIGHTS

13. Defendant reserves the right to file an Amended Answer with the Court to plead any verified pleas, affirmative defenses and claims, crossclaims or third-party claims, as applicable, after further investigation and discovery.

## VI.

## JURY DEMAND

14. Defendant hereby requests and demands a jury trial.

## VII.

## PRAYER

15. The above answer is respectfully submitted to the Court by the Defendant, who asks that Plaintiff take nothing, that the Defendant be allowed to recover the costs which have been incurred by reason of the charges and allegations by the Plaintiff against this Defendant, and that the Court give this Defendant such other and further relief from these charges as the Court may feel that this Defendant is entitled to.

## VIII.

## DEFENDANT'S COUNTER COMPLAINT

16. Defendant/Third-Party Plaintiff Saddler (hereinafter "Third-Party-Plaintiff" or "Saddler") seeks declaratory relief from and against the Third-Party Defendants, Carvana, LLC (hereinafter "Carvana"), Silverrock Group, Inc. (hereinafter "Silverrock") and Drive Time Automotive Group, Inc. (hereinafter "Drive Time") (collectively, "Third-Party Defendants").

## IX.

## PARTIES

17. Defendant/Third-Party Plaintiff Richard Saddler is an individual living and residing in the premises located at 413 Genoa Drive, Manchester, Missouri 63021.

18. Defendant/Third-Party Plaintiff Saddler seeks damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of court costs and fees.

4

19. Plaintiff, Bridgecrest Acceptance Corporation (hereinafter "Bridgecrest") is a foreign corporation organized and existing under the laws of the State of Arizona and duly licensed to do business in the State of Missouri.

20. Third-Party Defendant Carvana is a limited liability company organized under the laws of the State of Delaware.

21. Third-Party Defendant Silverrock is a corporation organized and existing under the laws of the State of Arizona.

22. Third-Party Defendant Drive Time is a corporation organized and existing under the laws of the State of Arizona.

23. Drive Time is the parent company and "spun off' Carvana, Silverrock, and Bridgecrest.

24. Drive Time is a private company that is owned by Ernest Garcia, II.

## X
## JURISDICTION AND VENUE

25. All parties admit that venue is appropriate in this district.

26. Venue is proper in this District pursuant to Missouri Rules of Civil Procedure

    (hereinafter "MRCP") on the grounds that a substantial part of the events or omissions

    giving rise to the third-party complaint occurred within Missouri.

## IX.

## GENERAL

## INFORMATION

27. Saddler has never been served in the instant case by Bridgecrest but is filing ms answer and counter complaint in order to have this matter addressed in a prompt matter without unnecessary delay.

Page 5

28. Saddler was served with Tanzeela Khan's petition *See Exhibit K*

29. Even though Saddler was aware and anticipating the service of Bridgecrest's petition as mentioned above. Bridgecrest knew before they filed the *Motion to Remand* that service to Saddler was not done, but yet still, as of today, they have not withdrawn that known false statement.

30. It was disclosed by phone to Bridgcest's counsel Daniel Rabin of law firm Berman & Rabin's staff multiple times before September 1, 2021, that Saddler was served with the wrong petition.

31. In our initial arbitration hearing on August 26, 2021, Saddler also disclosed to current opposing counsel Mr. McFarland for corporate parties and Judge Lawrence Mooney, our Arbitrator. A special process server served the wrong petition to Saddler *See Exhibit K*

32. For Bridgecrest to knowingly mislead the Court is undoubtedly sanctionable conduct by the Corporate Parties and Counsel.

33. Ernest Garcia, II was a player in the savings and loan crisis in the late 1980's and he pled guilty to felony charges of fraud in 1990; therefore, he is unable to be the CEO of a publicly traded corporation.

34. Carvana was founded in 2012 by Ernest Garcia, III, Ryan Keeton and Ben Huston. Carvana went public on or about April 28, 2017. Carvana's shares ended the day at $11.10. On or about January 24, 2020, Carvana shares were $83.11 with their highest value being $99.19 in or about December 2019.

35. Blomberg reported that Ernest Garcia, II's felony conviction was not disclosed in Carvana's Security and Exchange Commission filings according to an article in Forbes.

36. The two largest shareholders of Carvana are Ernest Garcia, II and Ernest Garcia, III, who combined own a super majority of Carvana shares which provide them with controlling

voting rights.

37. On or about November 19, 2014, the Consumer Financial Protection Bureau (hereinafter "CFPB") took action against a "buy here, pay here" car dealer named Drive Time and fined them a civil money penalty of $8,000,000.00. *See Exhibit A.*

38. "The CFPB noted that 'at least 45 percent of Drive Time's auto installment contracts were delinquent at a given time'." *See Exhibit A.*

39. Shortly thereafter Drive Time spun off its' loan servicing division and renamed it Bridgecrest Acceptance Corporation in 2016.

40. To Saddler's belief and knowledge Bridgecrest is a finance company that exclusively services auto loan debt for Drive Time and its affiliates.

41. To Saddler's belief and knowledge Carvana is a retailer of used motor vehicles that are obtained, in part, by and through Drive Time.

42. To Saddler's belief and knowledge SilverRock is a warranty company that is referred by Carvana to presumptive purchasers of used motor vehicles from Drive Time and/or Carvana.

43. To Saddler's belief and knowledge, when a vehicle is purchased form Carvana, Carvana uses Bridgecrest to service the loans from Carvana's customers.

44. To Saddler's belief and knowledge, when a vehicle is purchased from Carvana, Carvana uses SilverRock to service and/or administer all warranties and/or GAP insurance for Carvana's customers.

45. Under the "umbrella" of the ownership and/or control of Drive Time, the purchase of a vehicle from Carvana by a consumer such as Saddler, is then financed through Bridgecrest and the warranties are provided by SilverRock.

Page 7

46. On April 15, 2021, Bridgecrest electronically filled a Petition in the Circuit Court of Saint Louis County, Missouri, Circuit Court Division in Case No. 21SL-CC01705 ("Petition").

47. In the Petition, Bridgecrest alleged that Bridgecrest and Saddler entered into a written contract, without any proof of said contract.

48. In an affidavit that was attached to the Petition, Bridgecrest swears that Bridgecrest is a third-party servicer of accounts originated by Drive Time.

49. Saddler filed a prior suit against Carvana in the Circuit Court of Saint Louis, Missouri Case No. 19SL-CC05679 which Carvana removed from this Court to Federal District Court, Case No. 4:20CV105 HEA.

50. In Case No. 4:20CV105 HEA, the Court issued an Order on August 11, 2020 which granted Carvana's Motion to Compel Arbitration and Dismissed Case No. 4:20CV105 HEA. Even after the Federal Court ordered the parties to arbitrate, Saddler was sued in this instant matter Case No. 21SL-CC01705 by Bridgecrest Acceptance Corporation based upon the same facts and circumstances that were part and parcel of Saddler's complaint in the earlier case before this very Court.

51. Since August 11, 2020, additional facts have become known to Saddler and are alleged herein.

## XI.

## STATEMENT OF THE FACTS

52. Desiring to purchase a used vehicle, Saddler utilized Carvana's website to search for and locate a suitable vehicle.

53. After locating a vehicle, Saddler applied for financing through Carvana's related party

finance company, Bridgecrest.

54. Bridgecrest approved Saddler to finance $26,489.02 which included the price of the vehicle, TAVT tax, license fee, vehicle protection and GAP coverage, at an interest rate of 12.61%.

55. Vehicle protection and GAP coverage was administered by SilverRock at Carvana's direction and control.

56. On or about September 21, 2018, Carvana delivered a 2015 GMC Terrain Denali ("Denali") the second of two automobiles to Saddler at his residence in St. Louis County, Missouri, and upon delivery Saddler executed final documents acknowledging and accepting delivery. However, at that time Saddler was not aware that Carvana was in violation of Missouri State law R.S. Mo.§ 301.570 by not a being

licensed dealer that could legally sell motor vehicles in the State of Missouri. *See Exhibit L.*

57. These documents included a retail installment contract and security agreement, Carvana Care Agreement, credit reporting notice, odometer disclosure statement, and a GAP Addendum to retail installment contract.

58. On the first page of the buyer's guide that was provided to Saddler at the time of purchase it states a service contract is available at an additional charge. *See Exhibit B.*

59. In the Gap Addendum to Retail Installment Contract, the creditor is listed as Carvana with a Tempe Arizona address. SilverRock is listed as the administrator of the GAP Addendum. *See Exhibit C.*

60. In the Retail Installment Contract and Security Agreement, Carvana, LLC of Winder, Georgia is listed as the Seller. *See Exhibit D.*

Page 9

61. The Retail Installment Contract provides a security interest to Carvana, LLC of Winder, Georgia. *See Exhibit D.*

62. Pursuant to the Retail Installment Contract, Carvana is both the Seller and the Lender for the vehicle purchased by Saddler.

63. The Denali that was purchased by Saddler was located in the State of Georgia and was delivered to Saddler in the State of Missouri.

64. Upon receipt of the Denali, it contained a temporary tag from the State of Georgia, which is a violation of Georgia law.

65. On the date of purchase of the Denali, Carvana was not licensed to sell motor vehicles in the State of Florida.

66. Neither at the time of the sale or delivery of the purchased vehicle, nor any time subsequent did Carvana provide Saddler title or an assignment of a Certificate of Ownership to the purchase vehicle as required by Missouri law.

67. Approximately forty-five days after his purchase, and prior to the expiration of the temporary registration tags, Saddler was required to obtain at his expense and inconvenience the first of what would turn into several emissions inspections with odometer readings. Carvana told Saddler that he needed to take these actions and email the emissions test results to Carvana ostensibly so that Carvana could provide

    Saddler his vehicle title or an assignment of Certificate of Ownership and registered license plates. Carvana told Saddler that Carvana would cover the expense of obtaining his emissions test.

68. Saddler repeatedly requested that Carvana sign over said title, place Bridgecrest as lienholder.

Page 10

69. Despite providing a passing emissions test result via Fed.Ex and email as directed by Carvana, Saddler was informed that Carvana's processing company was unable to process the title and registration and requested original emission inspection and odometer readings issued by the State of Missouri and not the "copy" provided by mail or email.

70. Saddler repeatedly requested the title and registration for the vehicle he purchased.

71. The Retail Installment Contract and Security Agreement required Saddler to pay a license and title fee. *See Exhibit D.*

72. Saddler was making all required payments to Bridgecrest even though he was having ownership registration problems.

73. In April of 2018, Saddler began receiving emails from Carvana and Bridgecrest threatening repossession of the vehicle Plaintiff purchased to cover-up their behavior. *See Exhibit E.*

74. In April, Carvana then began to create additional items needed unrelated to emissions; but, Saddler immediately complied. *See Exhibit F.*

75. As a further consequence of Saddler's registration problems, he has been stopped repeatedly by police for driving without proper registered license plates. Saddler feels fearful for his and his family's safety because of potential ramifications from having to confront a hostile police officer due to umegistered license plates.

76. Beginning in approximately September of 2018 until approximately September of 2019, Saddler made all monthly payments to Bridgecrest in the amount of $527.00.

77. On October 14, 2019, Saddler made a payment to Bridgecrest which Bridgecrest stated made his account with them current. *See Exhibit G.* Saddler has in his possession the

recorded call from Bridgecrest/Plaintiff.

78. Saddler made his next payment to Bridgecrest on or before November 26, 2019, which was the due date for said payment.

79. Bridgecrest refused to accept and/or returned all payments made after October 14, 2019 and continues to do so.

80. SilverRock informed Saddler that they would no longer honor the service agreement because Carvana allegedly cancelled the service agreement.

81. Saddler has additionally suffered loss of time, inconvenience, annoyance, and embarrassment resulting from his vehicle purchase and Carvana's failure to assign Saddler a Certificate of Ownership or title pursuant thereto and by Carvana's further and ongoing failure to remedy their omission of failing to assign him a Certificate of Ownership.

82. Saddler has also incurred thousands of dollars in rental car expenses due to alleged conduct referenced herein.

83. The allegations contained herein establish that Drive Time asserted control over Carvana, Bridgecrest and SilverRock.

84. The actions of Carvana, Bridgecrest, SilverRock and Drive Time as described herein were outrageous because of their combined conscious disregard of their contractual and statutory obligations or otherwise reckless indifference to Saddler's rights.

85. In the General Court of Justice Superior Court Division of Wake County, North Carolina, File No. 21-CVS-8116, Carvana entered into a settlement agreement where their retail license to sell automobiles in the State of North Carolina was suspended for 180 days, effective on August 2, 2021. *See Exhibit H.* This settlement agreement was

in part due to Carvana's failure to timely deliver title work which is similar to the facts alleged above by Saddler.

## COUNT I-BREACH OFCONTRACT
## AS TO CARVANA, BRIDGECREST AND SILVERROCK

86. Saddler hereby incorporates by reference the foregoing allegations of this complaint as if set forth fully herein.

87. On or about September 21, 2018, Saddler entered into a contract ("Contract") with Carvana for the purchase of a used vehicle. *See Exhibit I.* The Contract was executed in St. Louis County, Missouri. The Contract names Carvana as "Dealer" for the sale of the subject vehicle.

88. In addition, on or around September 21, 2018, Saddler entered into a Retail Installment Contract and Security Agreement ("Finance Agreement") with Bridgecrest for the financing of the Denali. *See Exhibit D.*

89. Further, on or around September 21, 2018, Saddler entered into a Warranty Agreement with SilverRock. *See Exhibit J.*

90. The Contract and Missouri State law RS. Mo. § 301.210 required Carvana, among other things, to provide Saddler with title to the vehicle by assigning him a Certificate of Ownership upon performance by Carvana of his contractual obligations.

91. Saddler was never provided a Certificate of Ownership by Carvana at the time of vehicle delivery as required by Missouri law and which is necessary to register his purchased vehicle and/or within the time period as required by laws of the State of Georgia.

92. Saddler never received any evidence of proof of title to the Denali; therefore, Bridgecrest could not attach any security interest to the Denali.

93. Saddler performed fully in accordance with the Contract paying Bridgecrest each and

Page 13

every payment in the correct amount as it became due until approximately September 2019.

94. Carvana's failure to provide Saddler documents necessary to register his purchased vehicle constitutes not only a breach of Contract itself; but, also a breach of the implied covenant of good faith and fair dealing imposed upon every contract in Missouri.

95. Carvana's failure to provide Bridgecrest with any proof of ownership and/or title to the Denali requires the Finance Agreement and Warranty to have no legal effect.

96. As a result of the foregoing breaches of Contract, all Corporate parties have caused Saddler to suffer financial damages.

97. Accordingly, Saddler is entitled to an award of compensatory damaged in an amount to be determined at trial, as well as an award of punitive damages and attorney's fees, costs, and pre- and post-judgment interest.

## COUNT II-STATUTORY FRAUD
### R.S. Mo. §§ 301.210 and 301.570 AS TO CARVANA

98. Saddler hereby incorporates by reference the foregoing allegations of this complaint as if set forth fully herein.

99. R.S. Mo. § 301.210, provides any sale of a motor vehicle without transfer of title is fraudulent.

100. Carvana sold, or purportedly sold, a vehicle to Saddler without transferring title of the vehicle by assignment of a Certificate of Ownership as required by Missouri Statute R.S. Mo. § 301.210, and as such, the sale was fraudulent and void as a matter of law.

101. Carvana was repeatedly put on notice by Saddler, in addition to being notified by the Missouri State Attorney General, of the fraudulent nature of the vehicle sale.

102. Despite being aware of their failure to transfer title by assignment of a Certificate of

Page 14

Ownership and by thereafter refusing to remedy same, Carvana has caused Saddler to suffer financial damages.

103.    R.S. Mo. § 301.570, provides sale of six or more motor vehicles in a year without a license is prohibited ...

104.    At the time in which Carvana attempted to sell Saddler the Denali, Carvana was not a licensed dealer as required by Missouri law.

105.    Accordingly, Saddler is entitled to an award of compensatory damaged in an amount to be determined at trial, as well as an award of punitive damages and attorney's fees, costs, and pre- and post-judgment interest.

## COUNT III - CIVIL REMEDIES, ATTORNEY'S FEES AND PUNITIVE DAMAGES
## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT ("MMPA") - R.S. Mo.§§ 407.020 and 407.025 AS TO CARVANA, BRIDGECREST AND SILVERROCK

106.    Saddler hereby incorporates by reference the foregoing allegations of this complaint as if set forth fully herein.

107.    As herein alleged Carvana used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice and/or the concealment, suppression, or omissions of material fact in connection with the sale of the Denali to Saddler, to wit: Carvana misrepresented to Saddler that Carvana was prepared to assign a Certificate of Ownership upon Saddler's performance under the Contract; Carvana misrepresented to Saddler that Carvana would obtain an ownership interest in the Denali if he performed as required under the contract; but, despite Plaintiffs performance he has acquired no interests whatsoever in the Denali; and Carvana, and/or Bridgecrest, and/or SilverRock charged Saddler excessive fees for services and

Page 15

products of little or no value.

108.    Saddler's purchase of the Denali from Carvana was made primarily for personal, family or household purposes.

109.    Saddler purchased the Denali for personal, family or household purposes and suffered an ascertainable loss of money or property as a result of the use or employment by Carvana of methods, acts or practices declared unlawful by R.S. Mos § 407.020.

110.    Saddler has been damaged by Carvana, and/or Bridgecrest, and/or SilverRock's actions in an amount to be proven at trial for which he claims compensatory damages against Defendants.

111.    Carvana, and/or Bridgecrest, and/or SilverRock's conduct was malicious, fraudulent, oppressive and/or recklessly committed, with wanton disregard of Saddler's rights.

112.    Saddler is entitled to an award of punitive damages in an amount no less than $2,500.00 and reasonable attorney fees and legal expenses of this litigation, and interest against Carvana, and/or Bridgecrest, and/or SilverRock.

## COUNT IV - BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
## AS TO DRIVE TIME, CARVANA, BRIDGECREST AND SILVERROCK

113.    Saddler hereby incorporates by reference the foregoing allegations of this complaint as if set forth fully herein.

114.    Carvana represented to Saddler they were able to legally sell the Denali to Saddler.

115.    Despite Saddler performing as required under the Contract, Carvana failed to

perform as required by law and as set forth *supra* by delivering the Denali without providing Saddler an assignment of a Certificate of Ownership.

116.     Carvana is a sophisticated and experienced nationwide and also a licensed Missouri auto dealership with resources enabling it to be fully knowledgeable regarding their responsibility to assign a Certificate of Ownership at the time of delivery in Missouri of an automobile sold.

117.     This is especially true due to Carvana being a subsidiary of Drive Time.

118.     Despite Carvana's knowledge as imputed by and through Drive Time, of their legal duty to assign ownership at the time of deliver, Carvana shifted its statutory burden to provide and assignment of ownership to Saddler by requiring him to obtain his own emissions certification prior to Carvana assigning Saddler his Certificate of Ownership.

119.     As a result of Carvana shifting its statutory responsibility to Saddler by failing to assign a Certificate of Ownership and thereafter insisting Saddler obtain his own emissions certification prior to Carvana's assignment, Saddler has been denied the benefit of his bargained for exchange as represented by the parties' contract because he has no ownership interest m the Denali after more than a year of monthly payments.

120.     As a direct result of Carvana's breach of the covenant of good faith and fair dealing, Saddler has, or will, sustain damages in an amount to be proven at trial.

## COUNT V - CONSTRUCTIVE FRAUD OR NEGLIGENT MISREPRESENTATION AS TO CARVANA

121.     Saddler hereby incorporates by reference the foregoing allegations of this complaint as if set forth fully herein.

Page 17

122.    Carvana, in the course of their business as a used auto dealership, failed
to disclose that they were not an approved auto dealer in the state of Missouri. This
intentional conduct violates Missouri State law R.S. Mo. § 301.570 and was done for
Carvana's pecuniary gain. In addition, Carvana purposefully misled and gave false
information to Saddler about proper title information, which has caused the delay of
the purchase of the Denali as herein alleged, upon which Saddler reasonably relied to
his detriment in entering into the purchase of the Denali.

123.    In furnishing such false information Carvana failed to exercise
reasonable care or competence in obtaining or communicating such information to
Saddler.

124.    As a direst and proximate result of Carvana's negligent misrepresentations,
Saddler has suffered, and will continue to suffer damages, including pecuniary losses
in an amount to be determined at trial.

125.    Saddler has been damages by Carvana's actions for which he claims
compensatory damages against Carvana.

## COUNT VI- UNJUST ENRICHMENT
## AS TO CARVANA, BRIDGECREST AND SILVERROCK

126.    Saddler hereby incorporates by reference the foregoing allegations of this
complaint as if set forth fully herein.

127.    Carvana, and/or Bridgecrest, and/or SilverRock have knowingly benefited at
Plaintiff's expense by reason of their receipt of monthly payments with interest and fees
made toward the purchase price for the Denali.

128.    Allowing Carvana, and/or Bridgecrest. and/or SilverRock to retain such
benefit without assignment to Saddler of a Certificate of Ownership and a judgment for

Page 18

his damages would be unjust under the circumstances.

129.    Carvana, and/or Bridgecrest, and/or SilverRock's conduct was malicious, fraudulent, oppressive and/or recklessly committed with wanton disregard of Saddler's rights.

130.    Saddler has been damages by Carvana, and/or Bridgecrest, and/or SilverRock's actions in an amount to be proven at trial and he hereby tenders the return of the Denali for which he claims compensatory and punitive damages against Carvana, and/or Bridgecrest, and/or SilverRock.

## COUNT VII - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AS TO DRIVE TIME, CARVANA, BRIDGECREST AND SILVERROCK

131.    Saddler hereby incorporates by reference the foregoing allegations of this complaint as if set forth fully herein.

132.    Carvana, and/or Bridgecrest, and/or SilverRock's actions were the direct and proximate cause of emotional distress suffered by Saddler.

133.    Carvana, and/or Bridgecrest, and/or SilverRock had a duty to avoid engaging m conduct and/or actions and/or omissions that would unnecessarily and unjustifiably cause emotional stress to Saddler.

134.    Carvana, and/or Bridgecrest, and/or SilverRock breached their duty.

135.    Carvana, and/or Bridgecrest, and/or SilverRock was negligent in causing Saddler's emotional distress in that Carvana, and/or Bridgecrest, and/or SilverRock realized or should have realized with the foresight exercised by a reasonable person that their conduct and/or actions and/or omissions involved an unreasonable risk of causing Saddler emotional distress.

Page 19

136.     Furthermore, the actions of Carvana, and/or Bridgecrest, and/or SilverRock are

outrageous and evidence a complete indifference and conscious disregard for the rights

of others, Saddler is entitled to punitive damages.

## COUNT VIII – RACKETEER INFLUENCED AND CORRUPT

## ORGANIZATIONS (RICO)

### AS TO DRIVE TIME, CARVANA, BRIDGECREST AND SILVERROCK

137.     Saddler hereby incorporates by reference the foregoing allegations of this complaint

as if set forth fully herein,

138.     The Defendants participated in a 'pattern of racketeering activity;'

139.     This pattern consists of at least two acts of racketeering that were committed within

ten (10) years of each other.

140.     The financial and ownership of and to the Defendants establish that they are an

'enterprise'

141.     The enterprise engages in or affects interstate commerce.

142.     As a result, Saddler suffered an injury to his business or property.

143.     Saddler's resulted from a pattern of racketeering activity by the Defendants.

### PRAYER FOR
### RELIEF

WHEREFORE, Defendant prays for relief as follows:

a.       for the first count for Breach of Contract, an award of compensatory damages
and punitive damages in an amount to be determined at trial and an Order for specific
performance of the Contract, requiring Corporate Parties assign to Saddler a Certificate of
Ownership or in the alternative rescission of the contract and an award of damages; or

Page 20

b.      for the second count for Statutory Fraud, an award of compensatory damages and punitive damages in an amount to be determined at trial and an Order for specific performance of the Contract requiring Corporate Parties assign to Saddler a Certificate of Ownership or in the alternative rescission of the contract and an award of damages, or in
lieu of "a" or "b";

c.      for the third count for Violation of the MPA, an award of compensatory damages and punitive damages in an amount to be determined at trial and an Order for specific performance of the Contract requiring Corporate Parties assign to Saddler a Certificate of Ownership or in the alternative rescission of the contract and an award of damages, or in lieu of "a", "b", or "c";

d.      for the fourth count for Breach of the Covenant of Good Faith and Fair Dealing, an award of compensatory damages and punitive damages in an amount to be determined at trial and an Order for specific performance of the Contract requiring Corporate Parties assign to Saddler a Certificate of Ownership or in the alternative rescission of the contract and an award of damages, or in lieu of "a","b", "c", or "d";

e.      for the fifth count for Constructive Fraud/Negligent Misrepresentation, an award of compensatory damages and punitive damages in an amount to be determined at trial and an Order for specific performance of the Contract requiring Corporate Parties assign to Saddler a Certificate of Ownership or in the alternative rescission of the contract and an award of damages, or in lieu of "a", "b", "c", "d", or "e";

f.      for the sixth count for Unjust Enrichment, an award of compensatory damages in an amount of at least $75,000.00 as determined at trial, and

g.      for the seventh count for Negligent Infliction of Emotional Distress, an award of compensatory damages and punitive damages in an amount to be determined at trial, and

h.      for the eighth count for RICO, an award of compensatory damages and punitive damages in an amount to be determined at trial, and

i.      an award of all costs associated herein including and not limited to attorney's fees, and pre- and post-judgment interest, and

ı.      all other and further relief as the Court may deem just and proper.

## JURY DEMAND

Defendant/Third-Party Plaintiff requests a jury trial.

Respectfully submitted,

**Richard Saddler,** *Pro Se*
413 Genoa Drive
Manchester, Missouri 63021
Telephone: (310) 428-2110

Email:

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Process Server and or emailed, and/or certified US Postal Service to the registered agents or Representatives listed below on this 22nd day of April 2022, to the following:

**Richard Saddler,** *Pro Se*
413 Genoa Drive
Manchester, Missouri 63021
Telephone: (310) 428-2110

**In the**
# CIRCUIT COURT
**of St. Louis County, Missouri**

Bridgecrest
Plaintiff(s)

vs.

Richard Saddler
Defendant(s)

April 25, 2022
Date

2ISL-CCO1705
Case Number

12
Division

For File Stamp Only

# FILED

APR 2 5 2022

**JOAN M. GILMER**
CIRCUIT CLERK, ST LOUIS COUNTY

Order granting Leave of Saddlers

Amended ~~Pet~~ Answer and Counter - Complaint,

**SO ORDERED**

Judge

**ENTERED:** _____
(Date)

CCOPR47-WS  Rev. 02/14

M. Thomas McFarland                TN#33432
Attorney                                          Bar No.

15c Third Ave. S. Ste. 700, Nashville, TN
Address                                        37201

615-244-4994
Phone No.                                      Fax No.

Richard Saddler
Attorney                                          Bar No.

413 Glenola Dr   Il Manchester Mo
Address                                        63021

314-428-2110
Phone No.                                      Fax No.

EFiled: May 28 2020 04:36PM EDT
Transaction ID 65662949
Case No. 2020-0415-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ST. PAUL ELECTRICAL CONSTRUCTION PENSION PLAN, ST. PAUL ELECTRICAL CONSTRUCTION WORKERS SUPPLEMENTAL PENSION PLAN (2014 RESTATEMENT) and RETIREMENT MEDICAL FUNDING PLAN FOR THE ST. PAUL ELECTRICAL WORKERS, | § § § § § § | C.A. No.: 2020-___-___ |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| ERNEST GARCIA III, ERNEST GARCIA II, ERNEST GARCIA III MULTIGENERATIONAL TRUST III, ERNEST IRREVOCABLE 2004 TRUST III, ECG II SPE, LLC, VERDE INVESTMENTS, INC., MICHAEL MAROONE, NEHA PARIKH, IRA PLATT, JAMES D. QUAYLE, and GREGORY SULLIVAN, | § § § § § § | |
| Defendants, | § | |
| -and- | § | |
| CARVANA CO., | § | |
| Nominal Defendant. | | |

### VERIFIED CONSOLIDATED DERIVATIVE COMPLAINT

Plaintiffs St. Paul Electrical Construction Pension Plan, St. Paul Electrical

Construction Workers Supplemental Pension Plan (2014 Restatement), and

Retirement Medical Funding Plan for the St. Paul Electrical Workers (collectively,

"Plaintiffs"), by and through their undersigned counsel, submit this Verified Consolidated Derivative Complaint (the "Complaint"), upon knowledge as to themselves and their own actions and, as to all other matters, upon information and belief derived from the investigation of counsel, which included review of filings with the United States Securities and Exchange Commission ("SEC") and other publicly available documents concerning Carvana Co. ("Carvana" or the "Company") and allege as follows:

## INTRODUCTION

1.      This stockholder derivative action challenges a controlled company's decision to issue millions of shares to its controllers at a bargain-basement price. This issuance enriched the controllers while cheating the Company out of millions of dollars of fair value for the shares.

2.      Carvana is a leading e-commerce platform, selling used automobiles through the internet rather than through brick-and-mortar dealerships.  Its primary selling point is the ease, speed, and transparency of the car-buying process; for example, its most recognizable symbol is the 7-story coin-operated car vending machines it has installed in about two dozen cities.

3.      Carvana is controlled by the Garcia family.  Its CEO, Chairman, and President, Ernest Garcia III ("Garcia III"), is the son of used car mogul Ernest Garcia II ("Garcia II"), an ex-felon who amassed a fortune by selling cars and financing

2

packages to individuals with poor credit.  Garcia II and Garcia III control more than 92% of Carvana's voting power.

4.      Since its 2017 IPO, Carvana has grown at an astonishing rate.  In 2018 and 2019, its total revenue grew 131% and 95%, respectively.  But in the spring of 2020, the COVID pandemic wreaked havoc on Carvana's stock prices (along with the prices of almost all publicly traded stocks).  Against the backdrop of historic market dislocations, Carvana's stock hit an artificial trough that did not reflect the reality of Carvana's continued strong performance.  As was eventually disclosed with Carvana's Q1 2020 results, the Company had continued to perform well despite the COVID pandemic.  Indeed, Carvana was and is well placed to accommodate an anxious public concerned with the spread of a dangerous disease, as its primary competitive advantage and main selling point has always been that individuals can evaluate, choose, purchase, and receive their cars from their homes.

5.      While Carvana was trading in this artificial trough, insiders used their knowledge of the Company's actual performance—before the results of that quarter were published—to take a larger chunk of the Company on the cheap.  They did so through a share offering in which only they and their chosen investors could participate.

6.      Despite knowing that the Company was well positioned to weather the storm, the controllers caused, and the Board of Directors ("Board") permitted, a self-

3

dealing transaction that was designed to – and had the effect of – benefitting the controllers at the Company's expense.  By selling Carvana shares to the Company's controlling stockholders for a bargain-basement price, Defendants robbed the Company of tens and perhaps ***hundreds*** of millions of dollars of capital.  Revealing the inequity of the timing and price of the offering, within weeks of the offering Carvana made a second offering on May 22, 2020, and sold 5 million shares to the public for ***more than double*** what the controllers paid.  Plaintiffs seek to recover the substantial harm caused to Carvana by the sale of a substantial chunk of the Company to its controllers at an unfair, bargain basement price.

## THE PARTIES

### A.    PLAINTIFFS

7.    St. Paul Electrical Construction Pension Plan is a current Class A stockholder of Carvana and has continuously been a Class A stockholder of the Company at all times relevant to this action.

8.    St. Paul Electrical Construction Workers Supplemental Pension Plan (2014 Restatement) is a current Class A stockholder of Carvana and has continuously been a Class A stockholder of the Company at all times relevant to this action.

9.     Retirement Medical Funding Plan for the St. Paul Electrical Workers is a current Class A stockholder of Carvana and has continuously been a Class A stockholder of the Company at all times relevant to this action.

### B.     NOMINAL DEFENDANT CARVANA

10.     Nominal Defendant Carvana is a Delaware corporation headquartered in Phoenix, Arizona.  Carvana's Class A common shares are traded on the NYSE under the ticker "CVNA."  Carvana sells used cars through an online e-commerce platform.  Carvana is dominated and controlled by the Garcia family, including Carvana's founder (who is also the CEO and Chair of the Board), his father (the stockholder with the greatest voting power), and entities they control.  Article Twelve of the Company's Amended and Restated Certificate of Incorporation, effective as of April 27, 2017 ("Certificate of Incorporation") provides that this Court shall be the "sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, [and] (ii) any action asserting a claim for breach of fiduciary duty owed by any director, officer, employee or stockholder of the Corporation to the Corporation . . . "  The Certificate of Incorporation also indicates that "[a]ny Person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation (including, without limitation, shares of Common Stock) shall be deemed to have notice of and to have consented to the provisions of this ARTICLE TWELVE."

5

## C.   THE GARCIA PARTY DEFENDANTS

11.    Defendant Ernest C. Garcia III ("Garcia III") is the Company's founder and CEO.  Garcia III has been Carvana's CEO and the Chairman of its Board since the Company's inception.  Before launching Carvana, Garcia III worked for his father's company, DriveTime Automotive Group Inc. ("DriveTime"), as a Treasurer, VP and Director-Quantitative Analytics.  Before the stock offering that is the subject of this suit, Garcia III held 11,952[1] Class A shares and 3,664,526 Class B shares; assuming all of his LLC units in Carvana's subsidiary were exchanged for Class A shares, Garcia III would have held about 10% of the Class A shares at the time of the offering.  Together with Garcia II and their trusts, Garcia III controlled 93% of the voting power of the Company at the time of the stock offering that is the subject of this suit.

12.    Defendant Ernest C. Garcia II ("Garcia II") is Garcia III's father.  Like his son, Garcia II is a billionaire used car businessman.  As of April 1, 2020, Garcia II beneficially owned 57.4% of Carvana's Class A shares.[2]  He holds 52,937,458 Class B shares.  Garcia II also owns 66,171,823 Class A Units in Carvana Group (defined below).  With his son and the trusts they control, Garcia II controlled 93%

---

[1] This figure gives effect to the April 1, 2020 withholding of 79 shares as the result of taxes on restricted stock units that had vested.

[2] This percentage (representing 85,379,035 Class A shares) assumes exchange of all of his Class A common units into Class A shares.

of the voting power of the Company at the time of the stock offering that is the subject of this suit.

13.     Defendant   Ernest   Garcia   III   Multi-Generational   Trust   III ("Multigenerational Trust") is a trust over which Garcia II has sole investment and depository power.   Garcia III and his children are the sole beneficiaries of the Multigenerational Trust.   The Multigenerational Trust beneficially owns 100,000 Class A shares and 11,952,000 Class B shares as of April 1, 2020.   It also holds 14,940,000 Class A Units in Carvana Group (defined below).

14.     Defendant Ernest Irrevocable 2004 Trust III ("2004 Trust") is a trust over which Garcia II has investment and depository power.   Garcia III is the sole beneficiary of the 2004 Trust.   The 2004 Trust beneficially owns 11,834,021 Class B shares.   It holds 14,792,526 Class A Units in Carvana Group (defined below).

15.     Defendant ECG II SPE, LLC ("SPE"), an Arizona entity, is a limited liability company that is wholly owned and controlled by Garcia II.   SPE holds 8,000,000 Class B shares, as well as 10,000,000 Class A Units in Carvana Group (defined below), for which Garcia II is the beneficial owner.

16.     Defendant Verde Investments, Inc. ("Verde"), an Arizona corporation, is an affiliate of DriveTime.   Verde is wholly owned and controlled by Garcia II, who is its sole shareholder and director.   Garcia II participated in the Private Offering

7

(defined below) through Verde.  Verde purchased 555,556 shares in the Private Offering; Garcia II is the beneficial owner of these shares.[3]

17.     The Garcia Parties control and dominate Carvana.

**D.     DIRECTOR DEFENDANTS**

18.     Defendant Michael Maroone ("Maroone") has been a member of the Board since the Company's 2017 IPO.  Maroone has been designated as the "Lead Director" and is a member of the Board's Audit Committee.  Before joining Carvana, Maroone was the president and chief operating officer of AutoNation Inc., from 1999 to 2015, and was a member of AutoNation's board from 2005 to 2015.  He now serves as the chief executive of Maroone USA LLC, an automotive retail group that sells used and new vehicles.  Referring to Carvana's success as an e-retailer, Maroone noted that Carvana will put "tremendous pressure on brick-and-mortar" companies like his.

19.     Defendant Ira Platt ("Platt") has been a member of the Board since the Company's 2017 IPO.  He is the Chair of the Audit Committee and also a member of the Compensation and Nominating Committee.  He is the president of Georgiana Ventures, LLC ("GV LLC"), an entity he founded in 2009.  GV LLC provides equity

---

[3] Garcia II, Garcia III, Multigenerational Trust, 2004 Trust, SPE, and Verde are collectively referred to herein as the "Garcia Parties"; Garcia II, Garcia III, and Verde are collectively referred to herein as the "Insider Trading Parties."

and debt capital to specialty finance companies, acquires portfolios of consumer finance receivables and offers consulting services to the specialty finance industry. GV LLC is the managing member of GV Auto I, LLC. GV Auto I, LLC is a unitholder in Carvana's operating subsidiary. Garcia II appointed Platt to the board of Garcia II's company, DriveTime. Platt served as a DriveTime director from February 2014 until he was traded over onto the Carvana board at the time of Carvana's IPO.

20.     Defendant Greg Sullivan ("Sullivan") has been a member of the Board since the Company's 2017 IPO. He is a member of the Audit Committee and the Chair of the Compensation and Nominating Committee. Sullivan co-founded AFAR Media in 2007 and has served as its CEO since that time. Before 2007, Sullivan held various executive positions at DriveTime, including president (1995-2004), CEO (1999-2004), and Vice Chair (2004-2007).

21.     Defendant James D. Quayle ("Quayle") has been a member of the Board since the Company's 2017 IPO, serving on the Compensation and Nominating Committees. Quayle has been the Chair of Cerberus Capital, a private investment firm, since 1999. Quayle previously held various federal government positions, most recently as Vice President of the United States from 1989 to 1993. Quayle has been associated with Garcia II since the two "struck [a] relationship" many years

ago.  The Garcias have donated to the political campaigns of Quayle's son, Benjamin

Quayle, as well as to PACs led by Quayle.[4]

22.     Defendant Neha Parikh ("Parikh") has been a member of the Board

since 2019.  Parikh serves on the Compensation and Nominating Committee.

23.     Garcia III, Maroone, Platt, Sullivan, Quayle, and Parikh are collectively

referred to herein as the "Director Defendants."

## I.     SUBSTANTIVE ALLEGATIONS

### A.     CONVICTED FELON GARCIA II ENTERS THE AUTO SALES BUSINESS

24.     Before entering the auto sales business, Garcia II was a real estate

developer in Tuscon, Arizona.  His business cratered after he was convicted for being

a "key figure" in the Charles Keating Savings & Loan scandal.[5]  In 1990, Garcia II

pleaded guilty to felony bank fraud as a result of his participation in the scandal.[6]  In

---

[4] Garcia II donated $5,000 to Friends of the Majority, the beneficiary of which was
Ben Quayle, on August 12, 2012, and made a direct donation to Ben Quayle of
$2,400 on February 18, 2010.  Garcia II and Garcia III both made $2,400 donations
to Ben Quayle during his general election campaign in the second half of 2010.  In
1999, Garcia II donated $1,000 to Dan Quayle, as he was running for president.  In
March 1998, Garcia II donated $5,000 to Campaign America, a PAC associated with
Dan Quayle.  These sums were the maximum amounts an individual could give to
an individual candidate (or, in the case of Campaign America, to a PAC).

[5] James S. Granelli, *Lincoln S&L; Figure Pleads Guilty to Fraud: Crime: Ernest C.
Garcia II Admits Acting To Help The Thrift Hide Its Ownership of Some Risky
Deserve Land in Arizona*, L.A. TIMES (Oct. 31, 1990).

[6] Notably, although Garcia II is the Company's controlling shareholder, Carvana
does not disclose his history of fraud.

a related action brought against him by the SEC, Garcia II was charged with engaging in fraudulent real estate transfers. His conduct included serving as a "straw borrower," fraudulently obtaining a $30 million line of credit that also helped the savings and loan association hide its ownership of troubled desert land deals from regulators. In connection with the SEC action, Garcia II consented to an injunction barring him from future violations of federal securities laws. As the then-U.S. Attorney General noted, "This type of white-collar scheme—using 'straw borrowers'—is of particular concern because it is designed to conceal the true nature of the financial transactions involved." As a result of his conduct, Garcia II is prohibited from serving as an officer, director, or employer of any federally insured financial institution or a securities firm without government approval.

25. After his own firm went bankrupt and he served three years on probation, Garcia II formed "Ugly Duckling." Ugly Duckling sold and financed used cars for sub-prime purchasers with poor credit histories. Garcia II took the entity public in the mid-1990s, raising $170 million through a number of offerings. Ugly Duckling traded under the "UGLY" ticker.

26. As CEO of Ugly Duckling, Garcia II engaged in a series of self-dealing transactions (or, as Forbes cleverly put it, he "feather[ed] his own nest with Ugly

Duckling's assets").[7] These included causing Ugly Duckling to sell 17 properties to an investor group that he then leased back and re-bought a year later—***in his personal capacity***—at a 10% discount. He also caused Ugly Duckling to sell him one of its business units that loaned funds to other car dealerships, paying only book value. In March 2001, Ugly Duckling stockholders filed a derivative action against Garcia II and the company's other directors[8] challenging these and other improper transactions. Director Defendant Sullivan was on the Ugly Duckling board at the time and was also sued for fiduciary breaches.

27.    In the Ugly Duckling derivative action, stockholders alleged that Garcia II, Sullivan, and other Ugly Duckling directors breached their fiduciary duties by permitting related-party transactions that enriched Garcia II while cheating the company out of value.[9] The stockholders alleged that he pursued these transactions to enrich himself and to further his plans to take the company private for inadequate consideration. Indeed, while the case was proceeding, Garcia II tried to take the company private. The parties eventually reached a settlement, as a consequence of which Ugly Duckling was required to increase its proposed merger consideration by

---

[7] Nathan Vardi, *Feathered Nest*, FORBES (Nov. 26, 2001).

[8] *In re Ugly Duck v. Ernest C. Garcia*, C.A. No. 18746 (Del. Ch.).

[9] "The purpose of these transactions has been to enrich Garcia, to increase the percentage of the Company he owns, and to further his plans to take the Company private for inadequate consideration." *Id.* (Consol. Am. Compl., Nov. 16, 2001).

12

***40.6% per share***.  The Court approved the settlement and the Supreme Court of Delaware affirmed the judgment.[10]

28.  In 2002, Garcia and Sullivan took Ugly Duckling private and renamed it DriveTime.  Garcia II filled the DriveTime board with his friends, including Platt, who would later be awarded a seat on the Carvana board.

29.  Ten years later, in 2012, the Garcias created Carvana as an LLC subsidiary of DriveTime.  On November 1, 2014, DriveTime spun Carvana off as a separate company.  On November 29, 2016, Carvana was incorporated as a Delaware company; in April 2017, it went public, with its Class A shares trading on the NYSE at the price of $15 per share.

## B.  THE GARCIA PARTIES STRUCTURE CARVANA TO PERPETUATE THEIR CONTROL

30.  The Garcia Parties structured Carvana as an "up-C" (i.e., umbrella partnership) corporation.  As a result, the public corporation, Carvana Co., is a holding company the sole asset of which is the stock of its wholly owned subsidiary Carvana Co. Sub LLC ("Carvana Sub.").  In turn, the only assets held by Carvana Sub are the units ("LLC Units") of the operating entity Carvana Group, LLC ("Carvana Group").  Carvana Sub. is the sole manager of Carvana Group and operates and controls its business.  The diagram below depicts the Company's

---

[10] *Palmer v. Berger*, 806 A.2d 164 (Table) (Del. 2002).

organizational structure, which one *Seeking Alpha* commentator observed is "fiendishly complex".

DIAGRAM A:



31.     Carvana Group has two classes of LLC Units:  Class A Units and Class B units.  Carvana is required to maintain a 4-to-5 ratio between the Class A shares issued by the Company and the number of Class A Units it owns.  In addition, it must maintain a 4-to-5 ratio between the Class B shares owned by LLC Unitholders and the number of Class A Units held by those LLC Unitholders.

32. The purchase price for LLC units is 0.8 times the price of Class A shares.

33. As part of the IPO, Carvana entered into an Exchange Agreement that permitted LLC Unitholders to exchange LLC Units for shares of Class A common stock (or, at the Company's election, for cash).[11]   In 2019, LLC Unitholders exchanged 5.1 million LLC Units and 3.1 million Class B shares for 4.3 million shares of Class A common stock.

34. This "up-C" structure was designed by the Garcia Parties to protect the tax benefits of the existing owners at the time of the IPO while providing them liquidity options.   As a result of the up-C structure, Carvana—the publicly held company—holds a ***minority stake*** in the entity that actually operates the business and makes the money.[12]   The rest of the interest is held by persons—including the Garcia Parties—who own LLC Units in Carvana Group.   Because the Garcia Parties hold their economic interests mostly though the LLC, rather than the public company, their interests can conflict with those of the minority shareholders.

---

[11] Should an LLC Unitholder choose to exchange her Class A shares, she would be required to turn in Class B shares she held in an amount equal to the number of Class A shares she was receiving; the Class B shares would then be cancelled. Thus, a Unitholder's voting power would be diminished in proportion to the number of LLC Units they ceded.

[12] Following the Offering, Carvana owns just 38% of the economic interest in Carvana Group.

15

## C.   DUAL CLASS SHARE SYSTEM SOLIDIFIES THE GARCIA PARTIES' CONTROL

35.   The Garcia Parties set Carvana up with a dual-class stock structure. This ensured that they could maintain control over the business, even if they owned far less than half the economic interest in the Company and far less than a majority of total capital stock.

36.   Although Carvana's Class A shares are traded on NYSE, the Class B shares are not listed or traded on any stock exchange. Instead, all of the Class B shares are held by LLC Unitholders. As of February 21, 2020, there were 11 such shareholders.

37.   In almost all cases, shares of Class A and Class B common stock vote as a single class. Each Class A share entities its holder to one vote. Class B shares held by investors other than the Garcia Parties entitle their holders to one vote, as with Class A shares. The Class B shares held by the Garcia Parties, however, entitle their holders to *ten votes* per share.[13]

38.   This "high-low" voting structure cemented the Garcia Parties' power to control the outcome of all decisions submitted to shareholders for a vote, including

---

[13] This 10-to-1 vote ratio is in place so long as the Garcia Parties beneficially own at least 25% of the outstanding Class A shares (determined on an as-exchanged basis assuming all of their Class A units were exchanged for Class A common stock). At all times since Carvana's IPO, the Garcia Parties have held more than 25% of the outstanding Class A shares.

the election of directors and the "overall management and direction" of the

Company. This is so despite the fact that the Garcia Parties own a minority of the

economic interest in the Company. As the Company has acknowledged, the dual-

class structure

> giv[es] the Garcia Parties the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company and its assets, and current investors, executives and employees with the ability to exercise significant influence over those matters.[14]

39.   The Company's SEC filings repeatedly acknowledge—as they must—

that Carvana is a controlled company. As controllers,

> the Garcia Parties have the ability to elect all of the members of our Board and thereby control our policies and operations, including the appointment of management, future issuances of our Class A common stock or other securities, the payment of dividends, if any, on our Class A common stock, the incurrence of debt by us, amendments to our amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions.

> In addition, the Garcia Parties can determine the outcome of all matters requiring stockholder approval, cause or prevent a change of control of our company or a change in the composition of our Board, and preclude any acquisition of our company.[15]

---

[14] Carvana Co., Prospectus Supplement (Form 424B2) at 15 (March 31, 2020) ("Private Offering Prospectus").

[15] *Id.* at S-4.

40.     In a particularly bold flouting of minority shareholders' interests, the Garcia Parties also immunized themselves from any internal prohibitions on related-party transactions.  Carvana's Amended and Restated Certificate of Incorporation ("Certificate of Incorporation") provides that the Garcia Parties have ***no duty*** to avoid usurping Carvana's corporate opportunities and that prohibitions on related-party transactions do not apply to them.[16]

41.     Although Carvana admits that it is a "controlled company," it purports to provide protections to stockholders.  For example, Carvana represents that it has an independent board.  That is not so.  As described more fully above, one of the directors, Garcia III, is part of the control group and is the son of the largest stockholder.  Three other directors have substantial ties to the Garcia family, including serving as funders of their entities, co-owning companies with them, and serving as executives and directors in the Garcia entities.

**D.     GARCIA II USES HIS CONTROL OVER CARVANA TO PROP UP DRIVETIME, PAYING IT MILLIONS OF DOLLARS EVERY YEAR IN NON-ARMS-LENGTH TRANSACTIONS**

42.     Continuing the trend started at Ugly Duckling of using his controlled company for his personal enrichment, Garica II used Carvana to prop up DriveTime.  DriveTime profits from a number of non-arm's-length arrangements with Carvana.

---

[16] *Id.* at S-5.

18

Among other things, DriveTime leases inspection and conditioning stations and other real estate to Carvana, contracts to repair vehicles for Carvana, services loans for Carvana, and even provides private planes for Carvana. Carvana paid DriveTime more than \$5 million in 2019 for these services.[17] Similarly, Carvana paid more than \$2.8 million in 2019 to Verde, another entity controlled by Garcia II[18]. As DriveTime's sole stockholder, Garcia II benefitted from these arrangements. Given its close relationship to DriveTime, Carvana admits that it is "dependent on DriveTime for a number of important operations "[19] and, because of its historical reliance, would be "adversely affected" if DriveTime were unable or unwilling to continue to provide those services.[20]

---

[17] Carvana paid DriveTime about \$2.5 million for expenses relating to leasing several car reconditioning centers; another \$1.1 million for leasing a reconditioning center in Georgia; \$800,000 for leasing office space and parking spaces at DriveTime facilities; \$700,000 for a reconditioning center in Cleveland, \$60,200 for rent relating to a reconditioning center in Nashville along with \$2 million for leasehold improvements at the facility. DriveTime also earned about \$26.1 million in 2019 for serving as the servicer on various loan and finance receivables originating from Carvana.

[18] Carvana paid Verde \$2.8 million relating to the lease of a reconditioning center other real estate in Arizona and \$42,500 for one month's rent for a lease Verde assume in Tempe, Arizona.

[19] 2019 10-K at 19.

[20] 2019 10-K at 20.

19

**E.    CARVANA'S STOCK PRICE IS TEMPORARILY DEPRESSED AS A RESULT OF THE PANDEMIC PANIC**

43.    In early 2020, stock prices tanked in the wake of the COVID-19 pandemic.  With the S&P and Dow indices delivering their worst March since the Great Depression, Carvana's stock plummeted:



44.    Although the COVID shock affected Carvana's shares, the fundamentals of the business were still sound, as the Garcias and other corporate insiders knew.   Indeed, Carvana offered its customers a unique competitive advantage that is particularly salient during the pandemic.  Carvana – unlike other auto dealers – allowed its customers to evaluate, finance, buy, and receive their new

vehicles without leaving their homes and thereby potentially exposing themselves to the COVID-19 virus.

45.    The Company highlights this valuable feature on its homepage:



46.    As Carvana boasts, it is a "SAFER WAY TO BUY OR TRADE A CAR." Carvana's "goal to give everyone a peace of mind—even during some of our most challenging times. . . . Now you can shop for your next car 100% online . . . . We'll even bring your car right to your driveway with **touchless delivery** to keep you safe."[21]

_____

[21] Similarly, in a March 30, 2020 SEC filing, Carvana represented that it "believe[s] Carvana's online sales model, which allows customers to buy a car without ever coming into physical contact with another person, is the safest way to buy a car. . . . We believe it represents a significant step forward in the safety of retail auto sales

21

47.    As COVID concerns drove consumers to shelter in place, Carvana's touchless delivery poised the Company for continued growth.   While brick-and-mortar retail establishments were shuttering, Carvana experienced a 16% increase in its haulers' mileage from February to March.   On May 7, 2020, Carvana announced that it is nearly *tripling* its U.S. footprint, expanding its as-soon-as-next-day touchless delivery to 100 more markets.

48.    Garcia III touted COVID-19 as a major boon to his business, boasting: "Something's that's happened with this pandemic is that it's gotten many consumers who previously wouldn't have bought a car online to now buy it online."[22]   The Company's Q1 performance suggested that "Carvana has outperformed the industry quite significantly and grown our market share accordingly over this period," according to Garcia III.

49.    On May 6, 2020, commenting on the Company's Q1 2020 performance, Garcia III recognized that the public appreciated Carvana's approach and that its increase in sales was not just a blip:

> I think that in this new world, we now know the direction of a new customer preference, which is a preference for safety and minimizing unnecessary impact with other people that the customers don't know as well.  We know that that's likely to push demand in our direction and

---

in the current environment."  Carvana Co., Current Report (Form 8-K) at Item 7.01 (Mar. 30, 2020).

[22] Tina Bellon, *Used car deal Carvana expands as coronavirus fuels U.S. demand for online sales*, Reuters, May 7, 2020.

aid our goals increasing our market share. We don't' know how strong that impact will be. We don't know how persistent it will be, but it's pretty clear that's a directional impact. . . . We've made tremendous strides in the business. . . . We're in a really great spot.

50.     Data supported Garcia III's observations.  In early May, CarGurus published a survey in which it compared pre-pandemic buying attitudes to post-pandemic buying attitudes.  Before the pandemic, 32% of customers said they would consider buying a car online.  In early May, that number had almost doubled to 61%. "So, we do think that in this new environment, we have a very, very desirable offering," Garcia III commented. "I think across the economy, across different retail verticals and certainly in automotive, I think there seems to be a broadly held expectation that that [sic] e-commerce will be a relative outperformer during this time and coming out of this time.  And I don't think that that's a secret."

51.     Garcia III's observations were made in connection with the Q1 earnings release, which took place the first week of May.  The financials confirmed Garcia III's observations:  Carvana announced its Q1 car sales were *up 43%* year-over-year and its revenue was *up 45%* year-over-year.  Although these results were released on May 6, 2020, Carvana insiders—including Garcia III, and by virtue of his access to Company books and records, Garcia II—would have been aware of the Company's performance in the quarter ending March 31, 2020.[23]

_____

[23] Importantly, the LLC agreement that governs the LLC Unitholders (e.g., Garcia II) and their relationship with Carvana and Carvana Group provides that unitholders

**F.     CARVANA ENTERS INTO A PRIVATE DEAL TO SELL SHARES TO CONTROLLERS ON THE CHEAP**

52.     As Carvana's business (unbeknownst to the investing public) delivered strong growth, the Garcia positioned themselves to cash in.

53.     On March 30, 2020, Carvana announced that it was making a Registered Direct Offering ("RDO" or the "Private Offering") of 13.3 million Class A shares at $45 per share[24] The RDO was not open to the public.  Instead, Carvana was selling shares to controllers—the Garcia Parties—and other confidential, handpicked investors, including (as discussed below) Garcia II's friend, Mark Walter.[25]  The Garcia Parties—who undoubtedly had access to the Company's books and records and knew of its strong performance in the face of the COVID pandemic—were able to grab big chunks of the Company on the cheap when they had material, nonpublic information about the Company's relatively strong performance.

---

"ha[ve] and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries . . . " Section 5.6, Unitholder Agreement.

[24] Carvana had filed a shelf registration statement in 2019, enabling the Company to sell registered shares in the future, requiring them only to file a prospectus supplement before the sale.

[25] Walter purchased his shares through an entity he owns and controls, CVAN Holdings, LLC, an LLC Unitholder.

54.     Carvana announced that it would offer 13,333,333 shares in the Private Offering.  Before the Private Offering, there were 50,602,132 Class A shares outstanding.  The Private Offering thus would increase the number of Class A shares by ***more than 25%***.  Despite this massive expansion of the Class A class, none of these new shares would be offered to the broader public.  Instead, Garcia II (through his entity, Verde) would purchase $25 million of shares and Garcia III would purchase another $25 million.  With this purchase, Garcia III increased his Class A share holdings by ***more than 4,600%***.  The Garcia Parties already controlled the Company primarily through their ownership of super-voting Class B shares; with the Offering, they grabbed more of the economic benefits of the Company at a cut-rate price.

55.     In addition to the Garcias, one of the substantial participants in the Private Offering was Walter, the billionaire buddy of Garcia II.  Through CVAN Holdings, LLC, which Walter controls, Walter purchased 400,000 shares in the Private Offering.  Because CVAN Holdings is an LLC Unitholder, Walter has access to non-public information about the performance of the Company.    The balance of the Private Offering shares were sold to a limited number of undisclosed investors.

56.     The $45 per share Private Offering price represented a substantial discount to Carvana's recent trading prices.  A $45 per share price equated to an 8.238% discount to Carvana's $49.04 closing price on March 27, 2020, the last

25

trading day before the offering was announced,[26] an 11.8% discount to the $51.02 average closing price for the five preceding trading days, and a 25.2% discount to the thirty-day volume weighted average share price of $60.19.

57.     Compounding the impact of pricing the Private Offering at a discount to Carvana's trading prices, the Private Offering took place when the stock's price was in an abysmal trough driven by COVID panic.  Indeed, on the last trading day before the pricing for the Private Offering was announced, Carvana's stock was trading near its lowest closing price in years:



---

[26] From certain investors' SEC Form 4 filings, it appears that the participants in the Private Offering executed an Investment Agreement with Carvana on or about March 28, 2020, pursuant to which they participated in the Private Offering.

58.     Given Carvana's stellar performance and strong balance sheet, the timing of the Private Offering is suspicious.  Carvana did **not** need to proceed with an equity raise at this time.  In fact, it admitted in its Prospectus Supplement that the net proceeds would be contributed to Carvana Sub, which would then acquire newly issued Class A Units in Carvana Group, which would use the funds for "general corporate purposes."  But Carvana could not specifically identify *which* corporate purposes it needed the funds for.  Indeed, as it admitted in its Prospectus Supplement, "At this time, we have not specifically identified a material single use for which we intend to use the net proceeds, and, accordingly, we are not able to allocate the net proceeds among any of these potential uses in light of the variety of factors that will impact how such net proceeds are ultimately utilized by us."

59.     Carvana suggested it would use the funds for the very vague and general purpose of "fund[ing] our operations and growth."  But Carvana was not having difficulty funding its operations and growth.  As described above, even during the COVID pandemic plunge, Carvana's sales and revenue increased in Q1[27] more than *40%* year-over-year.  In addition, the Company had *substantial* liquidity available to it.

---

[27] Because Q1 ended on March 31, 2020, before the Private Offering closed, none of the Q1 performance could be attributed to the use of proceeds of the Private Offering.

60. It was clearly not necessary to proceed with the Private Offering at the *least advantageous* time for Carvana, which lost out on hundreds of millions of dollars in potential funds by jumping into a Private Offering at the stock's trough. Carvana should never have proceeded with an offering during the period in which the share price was so substantially—yet temporarily and artificially—affected by the pandemic plunge. By choosing to time the Private Offering in a manner that enriched the controlling shareholders, Carvana likely lost double-digits per share in potential proceeds, or hundreds of millions of dollars in total.

61. The inequity of allowing the Garcias to buy Carvana stock in a *Private* Offering at $45 per share is particularly striking when juxtaposed against the price at which Carvana would make a *public* offering mere weeks later. On May 18, 2020, Carvana announced that it would proceed with a public offering of 5 million Class A shares (the "Public Offering"). In the Public Offering, Carvana sold shares to Citigroup Global Markets Inc. and Wells Fargo Securities, LLC, as underwriters, for *$92 per share*. Citigroup and Wells Fargo will expect to sell the shares at or near market price; Carvana closed at $94.74 on May 21, 2020. Instead of waiting for the stock price increase that would have predictably followed the Q1 earning announcement and offering more shares at $92 as part of the Public Offering, Carvana quickly acted at the time of the stock trough to deal 13 million shares to favored insiders at $45 a share in the Private Offering.

62.     Following the Public Offering, Carvana remained a minority holder in the operating entity, Carvana Group, holding just 38% of the economic rights.[28] The other 62% is held by the other owners of Carvana Group, including the Garcia Parties.[29]

## G.     THE PRIVATE OFFERING WAS NOT ENTIRELY FAIR TO CARVANA

63.     The Private Offering was not entirely fair to Carvana. It took place at the worst possible time for the Company and at a price lower than the share had traded in years in a "process" was designed to line the pockets of the Garcia family to Carvana's detriment.

### 1.     The Price Of The Private Offering Was Unfair

64.     The Company chose to announce and price the Private Offering when Carvana's stock was at its absolute lowest point in years. Although the stock had been trading at above $100 a share in mid-February, Defendants chose to time a Private Offering—and price the Private Offering shares—when the stock was temporarily depressed because of the overall market sentiments.

65.     Like all retailers, Carvana's stock price was affected by the COVID-19 pandemic. But Carvana (as the Garcia Parties knew) was uniquely positioned to

_____

[28] Carvana's 38% interest comes through its indirect ownership (through Carvana Sub) of 79,749,357 Class A Units in Carvana Group.

[29] IPO Prospectus.

29

address growing customer demand in safer car-buying experiences and had experienced massive growth between February and March. By providing a feature that allows customers to search for, compare, purchase, and receive their cars from the safety of their homes, Carvana addresses a growing market need for safety and security in the purchase of vehicles. As a result, throughout the quarter, Carvana's stock price outperformed the auto industry as a whole, and even the S&P 500 index.

66.      The insiders—including the Garcia Parties—knew that the Company's fundamental strengths had not changed. In recent years, Carvana had been experiencing rapid growth. Its revenue had increased from $858.9 million in 2017 to $3.9 billion, a *4.5x increase in just two years*.

67.      Those with access to non-public information—like the Garcia Parties— understood that the fundamentals of the Company had not changed. They knew that their Company was addressing a growing concern of the automobile-buying public. They also were aware that the Company had actually been performing relatively well during Q1, which ended March 31, 2019.

68.      Defendants also knew Carvana could have, and did, obtain flexibility with operational changes in response to COVID-19. As Garcia III told investors *after* the Private Offering, these changes included "limiting capital expenditures" as well as operating expenses. These changes left management "feeling really good

about our liquidity position even in deep stress scenarios because of those levers that we have in the business."

69.     Buying chunks of the Company's Class A shares at a discount certainly boosted the Garcia Parties' bottom lines. Because the stock price swiftly recovered, the Garcia Parties reaped millions of additional gains: Garcia II became $1.5 billion richer the first week of May alone, while Garcia III gained $700 million in that period.

70.     The unfairness of the Private Offering price is made stark by the fact that Carvana—little more than six weeks after the Private Offering—announced a Public Offering – at a **much** higher price. Instead of a $45 share price (an 8.2% discount to the then-current share price), the offer price for the 5 million share public offering will be "at market prices prevailing at the time of sale, at prices related to such prevailing market prices or at negotiated prices." On May 21, 2020, the Company sold the 5 million shares to the underwriters for a price of ***$92 each***—more than ***double*** what the Private Offering investors paid just weeks earlier.

### 2.     The Private Offering Was The Product Of An Unfair Process

71.     The grossly unfair price is little surprise considering the blatantly unfair process. Despite the clear self-dealing involved—wherein the Garcia Parties profited handsomely from an ill-timed and massively unfair price—the Board did not take any steps to ensure even the appearance of a fair process.

31

72.     The Carvana Board was not independent.  The Company states that five

of its six directors are independent, but this is not so.  Platt and Garcia II are friends

and Platt served on DriveTime's board in the past.  Sullivan worked with and for

Garcia II for years—landing them both in a fiduciary suit in this Court in 2000—and

even took DriveTime public together.  Quayle is also not disinterested because his

is friends with Garcia II, and both Garcia II and Garcia III have frequently

contributed to the campaigns of Quayle and his son.  In addition, all of the directors

are fully aware that Garcia II and Garcia III could have them removed at any time

for any reason.

73.     Despite this blatant self-dealing and the lack of an independent Board,

there is no suggestion in any of the Company's disclosures that the Board formed a

Special Committee of any remaining independent directors to consider the highly

conflicted Private Offering, nor is there any reference to any other special

precautions taken to protect minority shareholders.

74.     There is also no indication that the Board engaged any independent

firms to value the shares at or near the time of the Private Offering or to provide a

fairness opinion concerning the economic fairness of the Private Offering to

minority shareholders.

75.     There is no indication that anyone discussed the Q1 performance—of

which they would already have had indications—before deciding on the offer price.

32

The insiders knew the Q1 results (or the approximate results) before the Private Offering. The quarter ended March 31 and the offering price was announced on March 31. The insiders would have known the revenue increased from $755.2 year-over-year to around $1.1 billion, a 45% increase. They likewise would have known that the Company's gross profits had skyrocketed to around $138 million, a 56.4% increase from the $88.5 gross profit gained in Q1 2019. Even the number of units sold had improved, from 36,766 in the first quarter of 2019 to 52,427, a 42.6% increase. Assuming the exact figures for the entire quarter were not yet known on March 31, nevertheless it is likely that the insiders had an indication of what the results would look like.

76.     Rather than put in place protections to ensure that the Private Offering was fair to the Company, the Board negotiated a price with its own controllers and with other, confidential investors that served *their* interest: a bigger piece of the Carvana pie at a remarkable discount.

77.     In short, the Board stepped aside and allowed Carvana to be abused by the self-dealing Garcia Parties to reap millions of dollars. The Board apparently did nothing to protect Carvana's interests in a transaction rife with self-dealing, or to ensure that the Private Offering approximated arms-length transactions. Rather, the Board authorized a Private Offering at a bargain-basement price, foregoing significant capital, and choosing the method of obtaining liquidity that was poorly

timed and unfairly executed. In addition, the Company incurred substantial professional fees and other transaction costs, and hampered its ability to tap public markets in the future to raise money. Meanwhile, the controllers received a windfall.

78.     Accordingly, the Private Offering involved self-dealing transaction that did not receive approval from an independent board, and that concerned a self-dealing transaction with controlling shareholders on both sides of the transaction. It appears that absolutely no mechanisms were employed to provide the equivalent of arm's-length bargaining; rather, the process of deciding upon and proceeding with the Private Offering was grossly unfair.

## H.     THE PRIVATE OFFERING CAUSED SUBSTANTIAL HARM TO CARVANA

79.     Defendants caused Carvana to lose a significant amount of money by proceeding with the Private Offering when and in the manner that they did.

80.     Carvana suffered the loss of the proceeds of the Private Offering in an amount equal to the difference between the offered price of $45.00, and the price of a share at a more reasonable time for an offering, e.g., the price of the Public Offering only a month later when the share price was averaging above $95.00.

## II.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.     Plaintiffs bring this suit derivatively on behalf of Carvana to redress breaches of fiduciary duty and other equitable claims.

82.     The Demand Board consists of the six Director Defendants: Garcia III, Michael Maroone, Ira Platt, Greg Sullivan, Dan Quayle, and Neha Parikh.

### A.     AT LEAST FOUR BOARD MEMBERS CANNOT IMPARTIALLY CONSIDER A DEMAND BECAUSE OF THEIR RELATIONSHIPS WITH THE GARCIA PARTIES

83.     Garcia III, Sullivan, Platt, and Quayle cannot impartially consider a stockholder demand because of their interest in the subject transaction and/or their relationships with the Garcias.

84.     Garcia III was clearly interested in the Private Offering because he received a benefit not available to the minority stockholders: a significant number of Class A shares for purchase at a steep discount. In addition, his father is Carvana's largest shareholder, and, together with his father, Garcia III controls the Company.

85.     Sullivan has worked for, and side-by-side with, Garcia II for more than two decades, serving in a variety of positions for Garcia II's auto business from no later than 1999 until at least 2007. Sullivan joined Garcia II in a bid to take Ugly Duckling private in October 2000, after which Sullivan was to receive 20% of the company. In the April 2001 renewed bid to take the company private, Garcia had arranged for Sullivan to receive an option to purchase 20% of the acquiring company. Both Sullivan and Garcia II were sued together in this Court for breaches of fiduciary duty in relation to several related-party transactions involving Ugly Duckling, including with respect to the take-private deal. Sullivan's exposure in that

35

case turned on the willingness of Garcia II to settle the suit and to indemnify him for his costs.  Given his longstanding relationship and financial entanglements with Garcia II, Sullivan cannot impartially consider a demand.

86.     Platt is also not disinterested or independent of the Garcias.  GV Auto I LLC, which he controls, is a substantial unitholder in Carvana Group.  In addition, Garcia II and Platt are close, and Garcia II appointed Platt to the board of DriveTime, a company founded and owned by Garcia II.  Platt served as a DriveTime director from February 2014 until he was traded over onto the Carvana board at the time of Carvana's IPO.  Under these circumstances, Platt cannot impartially consider a demand.

87.     Quayle, too, is not independent.  He is personal friends with Garcia II. The Garcias have donated to his campaigns and those of his son to the maximum amount allowed by law.  From his options and RSUs provided to him for just two years of service as a director, Quayle made millions of dollars.[30]  Under these circumstances, Quayle cannot impartially consider a demand.

88.     Each of Maroone, Sullivan, Platt, Quayle, and Parikh know they are entirely dependent on the good will of the Garcia Parties for their directorships. They are aware that they could each be removed—without cause—simply if the

---

[30] Ed Lin, *Vice President Dan Quayle Has Made a Bundle From a Used-Car Company*, Barron's (Apr. 24, 2019).

Garcia Parties wish it. They also know that the Garcia Parties can ensure that any corporate action they wish will be taken. The Prospectus Supplement acknowledges this, indicating that the Garcia Parties control a variety of decisions, including the issuance of Cass A common stock, amendments to the certificate of incorporate and bylaws. The Director Defendants know that, even if they wanted to stop a corporate action, they would at most be nothing more than a momentary speed bump.

## B.    EACH OF THE DIRECTOR DEFENDANTS IS CONFLICTED BECAUSE THEY EACH FACE A SUBSTANTIAL RISK OF LIABILITY

89.    Each of the Director Defendants was on the Company's Board at the time of the Private Offering. Indeed, all of the Director Defendants—except Parikh, who joined in 2019—has been on the Board since the IPO.

90.    Carvana's Amended and Restated Certificate of Incorporation authorizes only the Board of Directors to issue shares of Class A common stock, on terms and conditions established by the Board in its sole discretion. It was therefore the responsibility of the Board to authorize the Private Offering and its timing.

91.    Each of the Director Defendants was aware that the price of Carvana's stock price was far below where it had been just weeks earlier, and substantially lower than the average share price in 2019. Each of the Director Defendants also knew that the Company had adequate liquidity. They also knew that the Company's performance—in terms of both revenue and car sales—was actually improving over the period year. They also knew that Carvana offered a particular competitive

37

advantage that placed in it an enviable position during the pandemic crisis vis-à-vis other auto retailers.  Each of the Director Defendants was also aware that the Garcia Parties would significantly benefit from the Private Offering at such a low price.

92.     Each of the Director Defendants had an undivided duty of loyalty to Carvana, which required them to advance the Company's best interests and to place those interests ahead of the interests of others (including the Garcia Parties) especially when such interests conflict, as they did here.  The Director Defendants were required to make decisions concerning capital raises that were based on the best interests of the Company and the stockholders, and to come to those decisions after a good faith, fair process.

93.     Instead of advancing the interests of Carvana, the Director Defendants favored the interests of the Garcia Parties and other hand-picked investors by selecting the time for a Private Offering that was *most* advantageous to the Private Offering participants and *least* advantageous to Carvana.  They chose a means of raising capital that preserved all of the benefits of a bargain-basement price for the Garcia Parties and other Private Offering participants.  In doing so, the Director Defendants robbed Carvana of potentially hundreds of millions of dollars of value.

94.     The Director Defendants—by favoring the Garcia Parties over the Company—disregarded their duty of loyalty consciously and in bad faith.  Thus,

each of the Director Defendants faces a substantial risk of personal liability in connection with his approval of the Private Offering.

95.    For each these reasons, a demand on the current Board would be futile and is therefore excused.

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively on behalf of Carvana against
### The Garcia Parties)

96.    Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

97.    As members of a control group, the Garcia Parties owed and continue to owe to Carvana and its other stockholders fiduciary duties.

98.    Garcia II also owed fiduciary duties as a director and officer of the Company.

99.    The Garcia Parties violated their fiduciary duty of loyalty by putting their own interests ahead of the interests of Carvana by proceeding with, approving, and profiting from, the Private Offering.  They caused the Company to sell a substantial number of shares at a bargain-basement price, which profited them at the expense of the Company.

100.    The Private Offering was not entirely fair to Carvana.

101.   As a result of the Garcia Parties' breaches of fiduciary duty, Carvana has been harmed and continues to be harmed.

102.   Neither Plaintiffs nor the Company have an adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty
### (Derivatively on behalf of Carvana
### against the Director Defendants)

103.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

104.   The Director Defendants owed and continue to owe fiduciary duties to Carvana. The Director Defendants breached their fiduciary duties by approving athe Price Offering of Class A shares to controllers and other private investors at a bargain-basement price. The Director Defendants' decision to engage in the Private Offering served only the controllers' interest in obtaining a larger degree of the equity interest in the Company at an artificial, heavily discounted price. Their actions disregarded Carvana's interest in maximizing the amount of proceeds the Company obtained in exchange for its shares. Instead, Board loyalists bent to controllers' pressure and bestowed a trove of valuable shares on them far below what the shares were actually worth.

105.   Garcia III owed Carvana fiduciary duties of loyalty and care. As the CEO of the Company, his task was to maximize profits for the Company. Instead,

he engaged in a self-dealing giveaway, designing a Private Offering that was available only to himself, his father, affiliates of his family, friends, and a limited number of other investors.  Garcia II failed to ensure that the Company obtained a fair price for the Class A shares or, to the extent necessary, to delay the Private Offering until such time as the Company could obtain more competitive prices from other investors.

106.   The Private Offering was not entirely fair to Carvana.

107.   As a result of the Director Defendants' breaches of fiduciary duty, Carvana has been harmed and continues to be harmed.

108.   Plaintiffs and the Company have no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty / *Brophy* Claim
### (Derivatively Against Insider Trading Parties)

109.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

110.   The Insider Trading Defendants purchased Class A stock when they knew the price of that stock was temporarily and artificially depressed as a result of the market-wide price plunge caused by the COVID pandemic.

111.   At the time they purchased such stock, they had knowledge of the general performance of the Company during Q1.  This information included, but was

not limited to, the fact that the Company's revenue and sales growth were not only healthy but experiencing increases of more than 40% year-over-year in Q1.

112.    The information to which the Garcia Parties had access was material, non-public information. This information was available to and was relied upon by the Insider Trading Defendants when they chose to cause the Private Offering to occur when it did, at the price it did, and when they participated in it.

113.    The material, nonpublic information concerned the Company's performance during the Q1 and its expected performance in the near future. This information regarded the Company's business and financial condition and was not known or knowable to the general investing public.

114.    The Insider Trading Defendants used the Company's own information to profit for their own gain before the public was made aware of the material non-public information. This profit constitutes a breach of the Insider Trading Defendants' fiduciary duties, on which the Company is entitled to impose a constructive trust and to require the disgorgement of any additional profits obtained thereby.

115.    Plaintiffs and the Company have no adequate remedy at law.

## COUNT IV

### Waste
### (Derivatively Against the Director Defendants)

116.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

117.   The Director Defendants, whose responsibility it was to manage the business corporate affairs of the Company, were entrusted with the duty of managing the property of the Company, loyally with due care and in the best interests of the stockholders.

118.   By authorizing and/or acquiescing to the Private Offering at terms highly favorable to the Company's controllers but at a price that was grossly unfair to Carvana, the Director Defendants' conduct constituted a waste of corporate assets. The decision to enter into the Private Offering was tainted by conflict of interest and bad faith.   The Director Defendants have violated their duties of loyalty, due care, and diligence.

119.   As a direct and proximate result of Direct Defendants' waste of corporate asset as alleged herein, Carvana has sustained damages.

120.   Plaintiffs and Carvana have no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### (Derivatively Against Garcia Parties)

121.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

122.   The Garcia Parties received (and welcomed) a substantial benefit as a result of the Private Offering, which they approved.   They obtained more than 100,000 Class A shares at a bargain-basement price.   They saved these substantial amounts by participating in a Private Offering they knew was unfair.

123.   There was no rational business justification or purpose for proceeding with the Private Offering when and in the manner chosen by the Garcia Parties.

124.   Carvana has been harmed by issuing more than 13 million shares at a heavily discounted price.

125.   Plaintiffs and the Company have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Declaring that demand on the Board would be excused as futile;

B.     Declaring that Defendants breached their fiduciary duties of loyalty and care;

44

C.      Entering judgment against Defendants for breaching their respective fiduciary duties of loyalty as directors, officers, controlling stockholder entities, and/or human controllers of controlling stockholder entities;

D.      Ordering all Defendants to repay Carvana the amount of each of the Defendant's respective unjust enrichment in restitution;

E.      Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duty;

F.      Ordering the Insider Trading Defendants to disgorge all proceeds received in connection with the Private Offering;

G.      Awarding damages against Defendants for breaching their fiduciary duties of loyalty and good faith to Carvana in connection with the Private Offering;

H.      Awarding Carvana damages it sustained as a result of Defendants' breaches of fiduciary duty;

I.      Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

J.      Awarding Plaintiffs their reasonable attorneys' fees, expenses, and costs; and

K.      Granting such other and further relief as the Court deems just and equitable.

Dated: May  28, 2020

**GRANT & EISENHOFER, P.A.**

By: */s/ Michael J. Barry*
    Michael J. Barry (#4368)
    Christine M. Mackintosh (#5085)
    Rebecca A. Musarra (#6062)
    123 Justison Street
    Wilmington, DE 19801
    (302) 622-7000

    *Counsel for Plaintiffs*